**In re COASTAL EQUITIES, INC., a California corporation, dba Diversified Financial Systems, et al., Debtor.**

**Bankruptcy No. 82–01744–M11.**

United States Bankruptcy Court, S.D. California.

Sept. 28, 1983.

M. James Lorenz, Trustee.

Keith E. McWilliams, Jennings, Engstrand & Henrikson, San Diego, Cal., for trustee.

Victor A. Vilaplana, Gray, Cary, Ames & Frye, Fletcher Paddison, Miller, Boyko & Bell, San Diego, Cal., for debtor.

Patrick C. Shea, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for Class A Creditors Committee.

Perry T. Christison, Christison, Martin, Oggel & Thomas, San Diego, Cal., for Class B Creditors Committee.

## OPINION REGARDING CONFIRMATION OF PLAN

JAMES W. MEYERS, Bankruptcy Judge.

### I

### INTRODUCTION

Coastal Equities, Inc., is a California corporation, incorporated in 1976, which had as its principal business the acquisition and sale of interests in real property. An involuntary petition, under Chapter 7 of the Bankruptcy Code ("Code"), was filed against Coastal Equities on April 29, 1982, which was converted by the debtor to a Chapter 11 proceeding on June 4, 1982.

At the outset of the case, there were many allegations made concerning the conduct of the sole shareholder of Coastal Equities, Mr. Phillip L. Jauregui. The allegations included, but were not limited to, violations of California Securities Laws, forgery, incompetence and mismanagement, and fraudulent and dishonest business practices. These allegations were made in the context of a motion to appoint a Chapter 11

1. The motion was originally a motion to appoint an interim trustee in the involuntary Chapter 7. When the case was converted to a Chapter 11, the motion was supplemented and modified to seek the appointment of a Chapter 11 trustee or, in the alternative, the appointment of an examiner.

trustee, which motion was granted and on June 28, 1982, an Order appointing Mr. M. James Lorenz as trustee was entered.[1] The moving creditors were successful in proving gross mismanagement and a general lack of faith and trust in the debtor as then constituted.

On July 6, 1982, a committee of unsecured creditors was appointed. Given the diverse interests of the various creditors, however, it became clear that a single committee could not adequately represent the entire body of creditors. Consequently, on September 7, 1982, an Order was signed appointing two separate committees. One committee, the "Class A Committee," represented creditors who had invested in fractionalized deeds of trust. The "Class B Committee" was comprised of general unsecured creditors and individuals who had invested in limited partnerships through the debtor.

Given the complexity and magnitude of the case, Mr. Lorenz, with the cooperation of the Creditors' Committees, has done a commendable job of administering the estate and attempting to propose a feasible and equitable plan of reorganization. The Trustee proposed his plan of reorganization on December 23, 1982.[2] After a series of revisions and amendments, the Trustee's third revised second amended plan ("Plan") came on for confirmation on July 13, 1983 and August 2, 1983. On August 2, 1983 this Court announced its intention to confirm the Plan and this Opinion explains the Court's decision.

### II

### BACKGROUND

Coastal Equities' principal place of business was located in Oceanside, California. Mr. Jauregui was the sole shareholder and president of the debtor prior to August 1978

2. The debtor filed a proposed plan of reorganization on October 21, 1982. The debtor apparently abandoned this plan when the Trustee's Plan was proposed, as evidenced from the lack of efforts to have it confirmed.

and since August of 1981, and was intimately involved in the management of the corporation. It was a syndicating company that raised trust deed money and managed property. Agents would solicit potential investors and receive sums of money which were invested through Coastal Equities. The business of Coastal Equities was principally two-fold. Approximately 2,300 investors invested in either: (1) a limited partnership which had as its general partner Coastal Equities;[3] or (2) fractionalized notes secured by either property owned outright by Coastal Equities or by Coastal Equities as general partner of one of the limited partnerships.

There are 39 active limited partnerships and approximately 20 limited partnerships which have been "resold" and which are awaiting payments on the resulting notes. Coastal Equities acts as a collecting and disbursing agent in connection with these notes, and shares in the profits. Provided the notes are paid on schedule, it is estimated that the total income to the debtor should be approximately $1,200,000. It has not yet been determined by the Trustee exactly how many individuals invested in the trust deed aspect of the debtor's business.

The properties involved are developed and undeveloped properties located primarily in San Diego County, but there are several properties located in the states of Arizona, Georgia and Virginia. The majority of the properties is held in the name of the limited partnerships, with Coastal Equities holding record title to nine of the properties. These nine properties are encumbered by first trust deeds and the fractionalized trust deeds of Coastal Equities' investors. It was indicated at the hearing that these properties are overencumbered by at least $6,000,000, although it should be noted that the value of the properties controlled by Coastal Equities is in dispute. The debtor, in its Schedules of Assets and Liabilities, estimated the value of the properties to be approximately $54,000,000. The Trustee, on the other hand, based upon a report prepared by the real estate appraising firm of R.B. McComic, Inc. ("McComic Report"), estimates the value of the properties controlled by Coastal Equities to be approximately $29,000,000.[4]

Perhaps the most significant dispute in this case is with regard to the validity of the various limited partnerships and fractionalized deeds of trust. The Trustee claims that the operation of the debtor was in fact a classic pyramid or "Ponzi" scheme which resulted in some investors being advantaged at the expense of others.[5] Certain properties were encumbered though there did not exist equity sufficient to secure the obligations. Other properties, however, had not yet reached the point of being overencumbered when operations ceased and the Trustee took over control of the enterprise.

It is the position of the Trustee that due to certain irregularities in the formation and operation of the limited partnerships, no separate entities were ever actually established. Further, due to improprieties in the execution of the notes and trust deeds,

---

**3.** The general partner was either Coastal Equities' tradename, Diversified Financial Systems, or its subsidiary, Diversified Financial Asset Corp., Inc.

**4.** On August 12, 1982, this Court entered an Order authorizing the employment of R.B. McComic, Inc., as real estate consultant to the trustee. McComic assumed the responsibility of preparing a comprehensive analysis of all of the properties involved, determining their value, and advising the trustee as to the possible disposition of individual parcels.

**5.** The term "Ponzi scheme" owes its origin to one Charles Ponzi, a Boston swindler made famous in the case of *Cunningham v. Brown,*

265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Mr. Ponzi's "scheme" involved the borrowing of money on an unsecured basis, and promising to return in ninety days, an astonishing $150 for every $100 loaned. He made no investments of any kind, but relied upon a geometrically increasing stream of investors to sustain the operation. Mature obligations were funded with monies from new investors. An outstanding characteristic of a classic "Ponzi scheme" is that the more the business succeeds, the more insolvent it becomes. *See United States v. Shelton,* 669 F.2d 446, 449 n. 2 (7th Cir. 1982).

no interests were ever conveyed to the purported trust deed investors.[6]

These issues have come up in the proceedings in several different contexts. Initially, these alleged deficiencies were used as support in the Trustee's motion to use cash collateral. Most recently, however, the Trustee was allowed the opportunity to present his argument in the form of an Order to Show Cause why all the assets of the limited partnerships should not be substantively consolidated into the debtor's estate. An evidentiary hearing was conducted on April 19, 20 and 21, 1983, at which time the Trustee attempted to prove that there was a disregard for the separateness of the limited partnerships. Documentary evidence and live testimony was presented, tending to prove, in the opinion of the Trustee, that funds were commingled between various limited partnerships. However, the Trustee was unsuccessful in proving this allegation at the hearing and the requested relief was denied. Nevertheless, the Trustee has not abandoned this theory and indeed, the Trustee's belief in his theory plays an important role in the Plan of Reorganization.

### III

### SUMMARY OF THE PLAN

The Plan sets up 15 classes of claims as follows:

*Class 1:* Administrative claims entitled to priority pursuant to Section 507(a)(1) through 507(a)(5), inclusive, of the Code.

*Class 2:* Pre-petition claims of taxing authorities and/or agencies entitled to priority pursuant to Section 507(a)(6) of the Code.

*Class 3:* Institutional lenders, purchase money lenders and other secured creditors secured in whole or in part by income producing properties.

*Class 4:* Institutional lenders, purchase money lenders and other secured creditors secured in whole or in part by non-income producing properties.

*Class 5:* General unsecured creditors.

*Class 6:* Non-electing investor trust deed holders.

*Class 7:* Non-electing limited partner investors.

*Class 8:* Electing investor trust deed holders.

*Class 9:* Electing limited partner investors.

*Class 10:* Class 6 claimants who have lost their litigation with the Trustee and/or other litigating investor-creditors who had claimed an obligation owing from a solvent purported limited partnership.

*Class 11:* Class 6 claimants who have lost their litigation with the Trustee and/or other litigating investor-creditors who had claimed an obligation owing from an insolvent purported limited partnership.

*Class 12:* Class 7 claimants who have lost their litigation with the Trustee and/or other litigating investor-creditors.

*Class 13:* Pre-petition claims of insiders, other than those of purported limited partnerships.

*Class 14:* Equity security holders.

*Class 15:* Holders of valid claims secured by valid encumbrances whose promissory notes have been brought current on or before the effective date of the Plan or who otherwise agree with Coastal Equities to another treatment of their claim, or whose legal, equitable and contractual rights are designated by Coastal Equities, on or before the

---

**6.** Briefly stated, the Trustee's argument to invalidate the limited partnerships is two-fold. First, California law requires investors to have the opportunity to select their partners (i.e., "Mutuality of Selection"). This was not done with respect to the Coastal Equities' limited partnerships and they are consequently invalid. Second, there was such commingling of the funds of the various limited partnerships that it would be inequitable to now recognize each as an independent entity.

With regard to the fractionalized deeds of trust, the Trustee's principal argument revolves around delivery. There must be an intent to deliver an interest in the property and here, it is asserted, such an intent was lacking. Additionally, it is claimed that certain trust deeds were invalid since the trustor was never the record title holder of the property conveyed.

effective date of the Plan, not to be altered by the Plan.

As will be discussed in more detail, the Plan proposes a voluntary consolidation of all of the properties involved. This pooling feature will have little impact on Classes 2, 3 and 4.

Class 2 tax claimants will receive 100% of their claims, paid in 12 semi-annual payments for the principal, and six annual payments which shall constitute interest sufficient to ensure that the claimants receive present value for their claim. Therefore, since they are not affected and pursuant to Section 1129(a)(9)(C), Class 2 is deemed to have accepted the Plan.

Class 3 and Class 4 claimants are similarly treated in many respects. Both classes will retain their status as debt obligations. They are placed in different classes, however, since Class 3 claims are secured by property with a cash flow sufficient to satisfy the monthly debt service on valid encumbrances. Class 4 claims, in contrast, are secured by property with a net income insufficient to service all of the valid encumbrances.

Class 3 claimants will have their notes brought current within 12 months and will then receive the monthly amount called for in the note or other writing evidencing the claim. Once the note is thus fully reinstated, the automatic stay will be dissolved as to those Class 3 claimants.

Class 4 claimants will receive monthly payments, provided there are funds remaining after payment of expenses and senior lienholders, but only to the extent of the monthly interest called for in the note. This payment plan will continue for 15 months, after which time any and all arrearages due will be added to the outstanding principal balance, and all shall bear interest in an amount sufficient to yield the full value of the claim.

The automatic stay is to continue for a period of time with regard to both Class 3 and 4 after confirmation, unless relief is granted pursuant to a proper request. This is a noteworthy feature of the Plan since, even after confirmation, these creditors may still test whether they are adequately protected under Section 362 of the Code by filing a motion for relief from stay. Additionally, the treatment of both classes allows that, for a period of six years or until a sale or transfer of the property securing the claim, the note and deed of trust are fully assumable by any solvent purchaser. Both classes are impaired under the Plan and both rejected it. The Trustee, consequently, had to seek confirmation over the objections of these two classes pursuant to Section 1129(b).

Class 5, the general unsecured creditors, voted to accept the Plan. Of the 24 creditors in Class 5, 22 voted for the Plan, one against and one failed to cast a vote. The 22 affirmative votes represent approximately $79,366 or 94% of the dollar amount in the class. They are to receive 15% of their claims as these funds become available. If a Class 5 claimant can demonstrate that its claim is in fact against a validly formed limited partnership, then such a claimant is entitled to an appropriate amount as will be determined.

The most unique feature of the proposed Plan is found in the treatment of claims in Classes 6, 7, 8, and 9. As mentioned above, some investors were fortunate enough to have had their monies invested in property which had not yet become overencumbered. As a result, these fortuitous few could potentially stand to obtain a return on their investments, while the remaining investors would not only not realize such a profit, but would most likely lose the bulk of their principal investment as well.

To remedy this apparent inequity, the Trustee's Plan proposes a *voluntary consolidation* of properties and interests in properties. This allows for a fair return to all similarly situated investors.

Coastal Equities holds undisputed title to certain properties, but the equity in these properties would be all but exhausted upon satisfying the administrative claims. At the confirmation hearing, it was established that in a Chapter 7 liquidation, there would be less than a one percent dividend availa-

ble to unsecured creditors. This figure is based upon the property held in record name of Coastal Equities only, without considering the property purportedly held by the limited partnerships. This is also after deducting administrative expenses estimated at $1,250,000. Under the Plan, it is estimated that in addition to satisfying the undisputed secured claims of approximately $17,000,000, the dividend to investors will be approximately 27%.

The Trustee points out that it is only through the voluntary pooling of assets that there would be any substantial dividend to be paid to the investors. All properties held of record in the names of the various electing limited partnerships, along with debts owing thereon, and all electing investor notes secured by trust deeds, would be exchanged for stock in the reorganized debtor.[7] Each investor electing to participate would receive one share of new stock for each $1.00 initially invested with the debtor.

Those limited partnerships and trust deed investors electing not to participate will retain any and all rights afforded them by the instruments giving rise to their interests. This means that those classes will remain unimpaired. This also means, however, that the Trustee or any other investor or creditor would be free to pursue any litigation deemed appropriate in an effort to have the limited partnerships and trust deeds declared invalid. If the Trustee is successful in his efforts, these losing investors are put into Classes 10, 11 or 12, depending upon the nature of their interest.

These classes will generally receive less of a dividend than had they elected to pool their assets. Non-prevailing trust deed holders would be put into either Class 10 or 11, depending upon whether or not the limited partnership, against which the purported interest lies, is solvent. Provided certain conditions are met, Class 10 claimants will receive 100% of their claim as finally allowed by the court hearing the litigation. Class 11 claimants will receive the greater of: (1) 15% of their initial investment; or (2) liquidation value. Non-prevailing limited partnerships would be put into Class 12 and receive 5% of their initial investment.

The Plan clearly directs that investors be put to an election. They must choose to either pool their interest and receive whatever amount is available for distribution, or retain their interest and oppose any action taken by any interested party to invalidate it.

A majority vote of the dollar amount of a limited partnership is binding on that particular partnership with regard to electing to pool its assets. This "majority-rules" approach is, of course, subject to alteration if the partnership agreement requires more than a simple majority to take such action.[8]

An investor who votes in favor of the Plan is deemed to have included in such a vote all of his interests in any Coastal Equities assets. He cannot withhold from voting some of his interests and vote others affirmatively. This requirement was included to avoid potential conflicts of interests. If investors were not required to vote

---

7. As of August 2, 1983 when the final hearing on the confirmation of the Plan was held, more than 94% of the investor trust deed interests voting had voted in favor of the Plan. As of that time, 63% of the limited partner interests voting had voted to accept the Trustee's Plan. After the Court announced its intention to confirm the Plan, the Trustee was authorized to mail election forms to trust deed and limited partner investors who might still wish to participate in the Plan by exchanging their interests for stock in the reorganized debtor. Many of these investors did so elect.

The Trustee has indicated that as of September 22, 1983, there were investors holding 1,413 interests in various fractionalized trust deeds. The holders of 166 interests failed to vote, the

holders of 1,176 interests voted for the Plan or elected to accept stock in place of their trust deed interests. The holders of 71 interests voted against the Plan.

The Trustee has also indicated that there are investors holding 1,212 limited partner interests in various limited partnerships. The holders of 255 interests failed to vote. The holders of 611 interests had voted for the Plan or had elected to accept stock in place of their limited partnership interests. The holders of 346 interests voted against the Plan.

8. The Trustee indicated, however, that no partnership agreement calls for anything other than a simple majority to bind the partnership to any organic change.

their claims consistently, the same individuals could vote certain less-valuable interests into the Plan but opt-out the more advantaged claims.

The interests of insiders and equity security holders which are handled in Classes 13 and 14 will receive no distribution under the Plan and their claims are extinguished. Class 15 has rejected the Plan, but it is the Trustee's position that this class is unimpaired since members of this class will be paid in accordance with their notes.

In summary, then, it is claimed that Classes 1, 6, 7 and 15 are unimpaired under the Plan and are therefore deemed to have accepted it. Class 2 will receive the full value of its claim and this class as well is deemed to have accepted. Classes 5, 8 and 9 have affirmatively voted in favor of the Plan. Classes 3, and 4 have rejected it.

## IV

## OBJECTIONS TO THE PLAN

In a plan which is predicated on such diverse and unique treatment of creditors, a wide range of objections may be anticipated. This Plan is no exception. A total of seven written objections were filed by various investors and creditors, and it became necessary to continue the confirmation hearing to accommodate argument of counsel. Moments prior to the continued hearing, the Court was made aware of the fact that the majority of the investors who had objected to the confirmation of the Plan were withdrawing their objections. Those withdrawn represented the largest portion of the objections. This action was taken due to a settlement which had been reached between the Trustee and those objecting investors. Nevertheless, there remain several objections which require discussion.

▪ Several investors and creditors have objected to the confirmation of the Plan since it is, in fact, a plan of liquidation and not one of reorganization. The Plan does contemplate an ultimate liquidation of all of the assets of the estate, followed by payments to those investors electing to pool their assets. Any objection based upon

such a liquidation is, however, without merit. Although Chapter 11 is titled "Reorganization," Code Section 1123(b)(4) specifically provides for the sale of all or substantially all of the assets of a debtor and the distribution of the proceeds among the creditors. See 11 U.S.C. § 1123(a)(5)(D) and 1129(a)(11); In re Nite Lite Inns, 17 B.R. 367, 370, 8 B.C.D. 936, 938 (Bkrtcy.S. Cal.1982); In re East Redley Corp., 20 B.R. 612, 614 (Bkrtcy.E.Pa.1982). The legislative history of this Section leaves no doubt as to what was intended. The House Report to accompany the Code ("House Report") labeled a plan proposing the sale of the debtor's assets under Section 1123(b)(4) a "liquidating plan." H.R. No. 95–595, 95th Cong., 1st Sess. 407, U.S.Code Cong. & Admin. News 1978, p. 5787 (1977). Clearly the term "reorganization," as used in Chapter 11 of the Code, encompasses the systematic liquidation of a debtor. See In re Searles Castle Enterprises, Inc., 17 B.R. 440, 442, 8 B.C.D. 910, 912 (1st Cir. Bkrtcy.App.1982); In re L.N. Scott Co., Inc., 13 B.R. 387, 388, 7 B.C.D. 1280, 1281 (Bkrtcy.E.Pa.1981), 5 Collier on Bankruptcy, ¶¶ 1123.01[5] and 1123.-02[4] (1983).

▪ The bulk of the objections to the Plan comes from those creditors who will be placed in Classes 6 and 7. The gist of their objections is that the Plan violates Section 1129(b)(1) in that it unfairly discriminates against them. It is argued that if for any reason a non-electing investor should lose in litigation to the Trustee or creditor, placing an investor in Class 10, 11 or 12 is unfair discrimination and amounts to a penalty imposed for exercising a lawful right. Allowing classes 8 and 9 to receive a sizeable dividend and denying this right to losing Class 6 and 7 claimants, it is urged, is inconsistent treatment which violates the applicable Code provisions barring discrimination.

It is not clear exactly what change these claimants would propose. It cannot be reasonably argued that if a limited partnership or trust deed investor opts out and is later shown to have had a worthless interest, that this claimant should receive the same

amount as those investors who pooled their interests. This would clearly be an unfair result since it would serve to put Class 6 and 7 claimants in a no-lose situation. They would be able to test the validity of their interests without being required to pool their assets, and if, at a later date, it is shown that their interests are invalid, they would be able to receive what those who pooled received. This mechanism in the Plan is, in effect, a settlement offer. As in any settlement, the possibilities of success must be weighed and the positions of the parties evaluated. Class 8 and 9 creditors have analyzed the situation and decided to surrender a colorable claim to either a limited partnership or a trust deed interest for shares of stock in the reorganized debtor. Class 6 and 7 claimants, in contrast, have chosen to retain their interests subject to any and all infirmities which may exist. Retaining their rights causes Class 6 and 7 claimants to be unimpaired. Additionally, if shown to have had an invalid interest, a Class 6 or 7 claim is reclassified, but still receives more than it would in a Chapter 7 liquidation.

This Court is unable to perceive how the treatment of Class 6 and 7 claimants, facing the possibility of being reclassified, discriminates against them unfairly. Classes 6 and 7 are unimpaired and Classes 10, 11 and 12 receive more than they would in a liquidation. The reason Classes 8 and 9 receive more than losing Class 6 and 7 claimants, is that the former agreed to surrender their claims. They settled. The latter take a calculated risk and cannot later be heard to complain.

Coast Federal Savings, a Class 3 or 4 institutional lender, objects to the Plan since it impairs the enforceability of the due-on-sale clauses contained in its trust deeds. Coast Federal is a federally chartered savings and loan association and is the holder of the beneficial interests under first deeds of trust secured by three parcels of real property. Each of its trust deeds contains a due-on-sale clause which allows it to declare all indebtedness immediately due and payable upon a transfer of ownership of the property securing the obligation. As mentioned above, the Plan modifies such clauses by allowing all notes and trust deeds to be assumable for a period of six years or until a sale of the property.

Relying on the recent Supreme Court case of *Fidelity Federal Savings and Loan Association v. De La Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), ("De La Cuesta"), Coast Federal argues that its right to enforce a due-on-sale clause is guaranteed and protected by federal statute. *See* 12 U.S.C. § 1701j–3; 12 C.F.R. § 545.34(a). Since the Plan proposes to alter this right, it cannot be confirmed unless the questionable provision is deleted.

■ This Court finds that a due-on-sale clause is not something so sacrosanct that it is immune from modification in a bankruptcy setting. Coast Federal's position finds no support in the *De La Cuesta* decision. The focus in that case was on whether the federal regulation which authorized due-on-sale clauses preempted contrary state law. The Court held that the responsible administrative agency, the Federal Home Loan Bank Board, did not exceed the power delegated it by Congress when it expressed an intent to preempt state laws disallowing due-on-sale clauses. The holding was limited to recognizing the due-on-sale clause as a valid, enforceable contract right in spite of any conflicting state law. To argue that such a holding in any way limits the bankruptcy court's power to fairly and equitably modify this right is to make an unwarranted leap in reasoning. Code Section 1129(b) allows for confirmation of a plan notwithstanding the rejection by an impaired class, provided certain conditions are met. The Code is very explicit when it allows a plan to impair any class of claims. *See* 11 U.S.C. § 1123(b)(1). The authority cited by counsel objecting to the Plan merely *recognizes* the contractual right—the Code allows for fair and equitable modification or impairment of that right. When two statutes are capable of co-existence, absent a clearly expressed congressional intention to the contrary, it is the duty of the court to regard each as effec-

tive. *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939); *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1973). Effect is given to both statutes by first recognizing that the creditor has a valid contractual right which it may enforce, but then allowing proper impairment of this right as allowed under the Code. Further, the Code Section allowing the impairment of classes, Section 1123(b)(1) is a specific provision applicable to specific situations. This is contrasted by the due-on-sale clause statutes which are of general application. Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment. *See Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961); *Morton v. Mancari, supra,* 417 U.S. at 550, 94 S.Ct. at 2482; *Associated General Contractors of California v. Secretary of Commerce of the United States Dept. of Commerce,* 441 F.Supp. 955 (C.Cal.1977). Consequently, this Court need only concern itself with whether the impairment of this claim is fair and equitable as defined by Section 1129(b)(2).

The standards for forced confirmation, commonly referred to as "cram down" are found in Section 1129(b)(2)(A). The standard which is applicable in this instance would require that the holders of the claims must retain their liens on the subject property, and receive at least the value of such holder's interest. 11 U.S.C. 1129(b)(2)(A)(i). In short, the claimant must get the benefit of its bargain. With respect to Class 3 and 4 claimants, they will be retaining their liens and will be paid an amount calculated to yield the present value of their claims. This treatment affords each claimant the full value of its interest as required.

Moreover, the Plan allows a motion for relief from stay to be brought at any time should a claimant believe that it is not adequately protected. At that time, the individual claimant would have the opportunity to demonstrate that it is not receiving the full value of its interest.

■ The Court finds that the treatment of Classes 3 and 4 is fair and equitable not only as those terms are defined in Section 1129(b)(2), but also as those terms are commonly understood. As such, the Plan is confirmed over the objection of these two classes.

V

ANALYSIS OF PLAN

The goal of a reorganization plan is to achieve a correct and equitable distribution of the value of the reorganized debtor among the parties entitled to participate, based upon their respective rights. This is accomplished by first allowing the creditors to vote on the confirmation of the plan, after being fully and accurately informed through the use of the disclosure statement. Next, even in the absence of a creditor's formal objection, Section 1129 requires the court to make an independent assessment of compliance with Section 1129(a). *See In re Economy Cast Stone Co.,* 16 B.R. 647, 650; 8 B.C.D. 807, 809 (Bkrtcy.E.Va.1981); *See also, Securities and Exchange Commission v. United States Realty Improvement Co.,* 310 U.S. 434, 451, 60 S.Ct. 1044, 1051, 84 L.Ed. 1293 (1940).

■ Based upon the Court's own thorough examination of the Plan, the evidence submitted and argument of counsel at the confirmation hearing, and the Court's knowledge of the business and affairs of the debtor, this Court has concluded that the Plan satisfies the requirements found in Section 1129(a).

Specifically, this Court holds that the Plan was proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. 1129(a)(3). Though not defined in the Code, the case law which has built up around the term good faith offers guidance. Throughout the proceedings, the Trustee has abided by all court orders and has acted in the utmost good faith. *See In re Victory Const. Co., Inc.,* 9 B.R. 549, 7 B.C.D. 257 (Bkrtcy.C. Cal.1981); *In re Economy Cast Stone Co., supra,* 16 B.R. at 650, 8 B.C.D. at 809. Further, there is a reasonable likelihood that the Plan will achieve a result consistent with the objectives and purposes of the

Code. *See In re Nite Lite Inns, supra,* 17 B.R. at 370; Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study,* 38 Bus.Law. 1795, 1827 (1983).

It is also recognized that each creditor is receiving what it would have received in a Chapter 7 liquidation, as required by Section 1129(a)(7). In a Chapter 7 liquidation, after satisfying the administrative expenses, estimated to be $1,250,000, there would be less than one percent available to distribute to the creditors. Under the Plan, each creditor will receive in excess of that figure.[9] Consequently, the Plan satisfies the so-called "best interest of creditors" test. See 11 U.S.C. 1129(a)(7); H.R.Rept. No. 95–595, U.S.Code Cong. & Admin.News 1978, p. 5787 (1977); 5 Collier on Bankruptcy ¶ 1129.02[7] (1983).

Lastly, the Plan is both workable and feasible, and will not likely lead to the need for further financial reorganization.[10] *See* 11 U.S.C. 1129(a)(11); H.R.Rept. No. 95–595, 95th Cong., 1st Sess. 412, U.S.Code Cong. & Admin.News 1978, p. 5787 (1977). The structure of the Plan is sound and the appraised values of the properties realistic. There will be no wild speculation in the often volatile real estate market, which was at least partly responsible for the financial disaster of the past.

Under these circumstances, it is apparent that the Plan comports with all of the requirements of the Code. As such, it is proper that it be confirmed.

## VI

### CONCLUSION

The bankruptcy court is a court of equity. As such, it strives at all times for fairness, being guided by the rules and principles of equity, as well as law.

From a legal standpoint, the Plan complies with Code Section 1129. The majority of the various classes of creditors have either accepted it or remain unimpaired. With respect to those classes which have rejected it, confirmation is proper over their dissent, pursuant to Section 1129(b).

The Plan also measures up to the equitable standards this Court applies. It is fair and workable, and based upon the voluntary cooperation of many of the creditors, should provide a solution to the many financial problems which have plagued this debtor in the past. The systematic and orderly liquidation of the estate under the Plan will provide each creditor and investor with an amount in excess of that which would have been received in a Chapter 7 liquidation. This Plan is in the best interest of the creditors.

Therefore, based upon the foregoing, the Trustee's Plan of Reorganization will be confirmed.

---

**9.** As mentioned, Class 5 claimants will receive 15% of their claims, Class 8 and 9 claimants will receive approximately 27% based upon the "equity shift" resulting from the voluntary pooling; and Class 11 and 12 claimants (non-electing and losing trust deed and limited partnership interest investors) will receive 15% and 5% respectively. The remaining classes have either accepted (5, 8 and 9); are unimpaired (1, 2, 6, 7 and 15); or will retain their liens not subject to having the Plan confirmed over their objections (3 and 4).

**10.** Generally, the feasibility standard found in Section 1129(a)(11) requires a showing that the confirmation will not likely be followed by liquidation. *In re Northwest Recreational Activities, Inc.,* 4 B.R. 43, 6 B.C.D. 302 (Bkrtcy.N.Ga. 1980). This Section, however, goes on to indicate that a plan which contemplates liquidation, as the present one does, is feasible. The purpose of this Section is to prevent confirmation of visionary schemes which promise much more than can be realistically delivered, and which are ultimately followed by liquidation. *See In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659; 6 B.C.D. 1312, 1315 (Bkrtcy.1980).