**In re ELM CREEK JOINT VENTURE, Debtor.**

**Bankruptcy No. 87–52621–A–11.**

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Sept. 30, 1988.

occurs and relitigation of these issues would be    very inappropriate.

Ronald Hornberger, Plunkett, Gibson & Allen, San Antonio, Tex., for Elm Creek Joint Venture.

Michael Colvard, Martin & Drought, Inc., San Antonio, Tex., for Alamo Sav. Ass'n of Texas.

R. Wes Johnson, Groce, Locke & Hebdon, San Antonio, Tex., for Elm Creek Homeowners.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON CONFIRMATION OF PLAN OF REORGANIZATION

R. GLEN AYERS, Jr., Chief Judge.

On the 31st day of August, 1988, came on to be considered Debtor's Second Amended Liquidating Plan of Reorganization ("Plan"), after due notice, and the Court, having considered the Plan, the objections to confirmation of the Plan filed by Alamo Savings Association ("Alamo") and the Elm Creek Homeowners' Association ("HOA"), and the objection of HOA having been withdrawn following the close of the evidence, and the Court having considered the testimony of the witnesses, the exhibits introduced into evidence and the arguments and representations made by respective counsel for Debtor, Alamo, HOA and Elm Creek Holdings, Ltd. ("Holdings"), and the Court having considered the applicable law and facts of the case hereby states its opinion containing Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The Court first makes the following specific Findings of Fact:

1. Pursuant to the Plan, Debtor has properly classified priority claims, pre-petition tax claims, the secured claim of Alamo, the deficiency claim of Alamo, the claim of HOA, general unsecured claims and the claims of interest holders. The claims in each class are substantially similar. Upon written motion made prior to commencement of the hearing on confirmation, Debtor reclassified the claim of HOA for treatment in Class 3. Such reclassification was made without objection and specifically was agreed to by the only unsecured creditor voting, Pape–Dawson Consulting Engineers, who also voted in favor of the Plan. Further, the Plan specifies whether each class is impaired or unimpaired and the treatment of each impaired class provides for the same treatment of each creditor in a class, provides for the means by which the Plan is to be implemented and does not contain any provision which is inconsistent with public policy or the interest of creditors or the equity security holders with respect to the management of Debtor after confirmation of the Plan. Debtor filed its First Amended Disclosure Statement ("Disclosure Statement") which, upon notice and hearing, was approved by Order of the Court. Thereafter, the Plan, Disclosure Statement and Ballot for accepting or rejecting the Plan were mailed to all creditors and parties in interest more than 25 days prior to the commencement of the confir-

mation hearing on August 31, 1988. No acceptances of the Plan were solicited prior to approval of the Disclosure Statement.

2. The Plan provides for Alamo to receive certain property upon which Alamo has a pre-petition lien and which is commonly referred to as the "Lots." A credit against the debt owed to Alamo is to be given based upon a valuation made by the Court based upon the evidence adduced at the hearing on confirmation. The Court finds the fair market value of the Lots at the date of confirmation to be $4.1 Million. The Plan then provides for Alamo to receive payment of any Deficiency between the amount owed to Alamo and the fair market value of the Lots at date of confirmation with a provision for a first Deed of Trust Lien on the Property (as that term is defined in the Plan) to secure such payment.

The Plan further provides that Debtor will perform the following:

A. On the Effective Date, the payment in full of all priority claims in Class 1;

B. The payment of pre-petition tax claims in Class 1A, in full, within three years after the Effective Date, or upon the sale or refinancing of all or a part of the Property, whichever occurs first, with interest at the rate of nine percent (9%) per annum to be paid annually to each holder of an allowed claim in Class 1A. One vote was received in Class 1A from the City of San Antonio which voted in favor of the Plan;

C. The satisfaction of the Secured Claim of Alamo on the Effective Date by Debtor's execution and delivery to Alamo of a Special Warranty Deed to the Class 2 Property providing specifically that there shall be no merger of the title thereby conveyed with Alamo's pre-petition Deed of Trust lien. As set forth above, with respect to any Deficiency, Alamo shall received treatment in Class 3 for any such deficiency;

D. Satisfaction of the Deficiency claim of Alamo and the claim of HOA from the net proceeds from the sale or refinancing of the Property during a three-year term, commencing the first day of the calendar month after the Effective Date. Special provision is made for sale of the 26.64 Acre Tract first and for a disinterested third party to conduct any marketing and solicit sales. Further, provision is made to prevent any deadlock in acceptance of reasonable offers. Excess funds from any sales or refinancing are to be disbursed to the Creditors' Fund provided for Class 4, the allowed unsecured claims;

E. Payment of claims in Class 4 by distribution from the Creditors' Fund to be created from Net Proceeds from the sale or refinancing of the Property after the payment in full of the Class 3 Claims;

F. The payment of no sums to interest holders in Class 5 unless and until the holders of claims in Classes 1 through 4 and post confirmation loans by the venturers are paid in full;

3. Alamo is to receive its pre-petition collateral, the Lots, with a lien on the remaining property to secure payment of any deficiency with interest on such deficiency payable at the rate of ten percent (10%) per annum, payable in annual installments beginning one year after the Effective Date. In this manner, Alamo receives the indubitable equivalent of its claim and is assured payment in full out of the assets of the estate upon which it was given a post-petition lien prior to payment of any inferior claims. The Plan leaves unresolved, for resolution pursuant to an ongoing adversary proceeding between Alamo and HOA, the question of relative lien priority as between Alamo and HOA. The evidence adduced at the confirmation hearing clearly establishes that the members of the joint venture stand ready, willing and able to inject funds as necessary for the payment of the annual interest which will accrue on the Class 1A and 3 claims. The evidence adduced at the confirmation hearing, further, is uncontroverted that a three-year period within which to make sale or refinancing of the remaining Property is more than sufficient.

4. Debtor has filed all Monthly Operating Reports and there is no evidence that Debtor has failed to comply with the provi-

sions of Title 11 U.S.C. during the course of this Chapter 11 case.

5. Fees incurred prior to confirmation in the Chapter 11 case will be subject to Bankruptcy Court approval.

6. During the term of the Plan, there will be no change in the composition of Debtor or in the management of the Property.

7. In the event of a liquidation under Chapter 7 of the Bankruptcy Code, unsecured creditors in Class 4 would receive nothing, HOA would receive nothing and Alamo would receive less than the full amount of its secured claim. Accordingly, the creditors holding claims in Classes 2, 3 and 4 are receiving more under the Plan than they would receive in a liquidating case under Chapter 7 of the Bankruptcy Code.

8. The holders of claims in Class 1A consisting of pre-petition taxes will be paid within the period specified in § 1129(a)(9)(C) of the Bankruptcy Code, and with the payment of interest thereon at the rate of nine percent (9%) per annum will receive the present value of their respective claims; further, there are no votes in Class 1A against the Plan and one vote in favor of the Plan. Therefore, Class 1A has accepted the Plan. The holders of claims in Classes 1 and 1A are unimpaired with Class 1A having accepted the Plan and no claimant in Class 1 having cast a ballot with respect to the Plan. The holder of the secured claim in Class 2 has cast a ballot rejecting the Plan. The other claimholder in Class 3, HOA, has withdrawn its objection to the Plan and asked that the Court confirm the Plan. With respect to the holders of unsecured claims in Class 4, there has been one ballot by a non-insider cast accepting the Plan in the total amount of $6,137.37 and no votes against the Plan. There is no provision that claims in Class 4 will, in any event, be paid in cash and in full. Accordingly, one class of impaired claims under the Plan has accepted the Plan without reference to any acceptance by an insider.

9. The provisions of the Plan are feasible by virtue of the following:

A. On the Effective Date, funds will be contributed by the venturers to pay in full the priority claims in Class 1. Claims in Class 1A will be paid from contributions by the venturers over the three-year term of the Plan;

B. Alamo will receive the indubitable equivalent of its secured claim by virtue of its receipt of the Special Warranty Deed provided for in the Plan. With respect to any Deficiency, Alamo will be paid, with interest, from the proceeds of sale of the remaining Property. The only evidence on the value of the 26.64 Acre Tract and the approximately 142 Acre Tract commonly referred to as the "Greenbelt" is the opinion testimony of Debtor's appraiser, Mr. Scott Binford. This evidence reveals the 26.64 Acre Tract to have a value as of the date of confirmation of $2,901,000.00 and the Greenbelt to have a fair market value as of the date of confirmation of $711,-000.00. Further, there is a mechanism put into place by the modifications made to the Plan to meet certain prior objections which Alamo had with regard to potential deadlock among the venturers with regard to accepting bona fide offers. The mechanism put into place by the modifications to the Plan provide that Alamo and each of the two joint venture groups will have a single vote with respect to acceptance of bona fide offers. This mechanism will prevent any deadlock and further assures feasibility of the Plan;

C. On the basis of the foregoing, it is probable that the payments to Classes 1 through 4 will be made and it is not likely that confirmation of the Plan will be followed by liquidation or the need for further financial reorganization of the Debtor other than as provided for by the Plan. In the event that Debtor should default in the provisions of the Plan by failing to make the payments required to Class 3, the Class 3 claimholders will be entitled to foreclose the Deed of Trust liens on the remaining Property, thus precluding the need for any further reorganization.

10. With respect to the secured claim of Alamo, Alamo will receive the indubitable equivalent of its secured claim and then

will receive deferred cash payments on any deficiency, with such deferred payments being secured by a Deed of Trust on the remaining property. Since Alamo would not be entitled to interest on its unsecured deficiency, the interest rate provided, ten percent (10%) per annum, is more than sufficient, particularly in light of the fact that the Plan provides that the 26.64 Acre Tract will be put on the market for sale immediately, and that the Plan term is for only three years. In regard to treatment of Alamo's Class 3 claim, the Plan is fair and equitable. In this manner, the Plan provides that Alamo will receive payment on its deficiency, if any.

11. To the extent that any of the Conclusions of Law specifically set forth below are or may be deemed to be Findings of Fact, or to the extent that the Court's opinion which follows contains additional Findings of Fact which support its Order of Confirmation, the same are incorporated herein by reference as if fully set forth.

12. The Declaration of Covenants, Conditions and Restrictions recorded at Volume 7285, Pages 942–959 in the Bexar County Real Property Records, as amended and recorded at Volume 1918, Pages 786–832 in the Bexar County Real Property Records, is and remains in full force and effect and the Plan in no way modifies the duties, obligations and restrictions described therein.

## CONCLUSIONS OF LAW

The Court makes the following specific Conclusions of Law:

1. To the extent that any of the foregoing Findings of Fact are or may be deemed to be Conclusions of Law, or to the extent that any of the Court's opinion which follows contains additional Conclusions of Law which support its Order of Confirmation the same are incorporated herein by reference as if fully set forth.

2. Debtor has complied with the provisions of § 1129(a)(1) of the Bankruptcy Code by virtue of the proper classification of claims pursuant to § 1122 and the Plan's inclusion of provisions required under § 1123. Each class specified in the Plan contains claims which are "substantially similar," and the Plan contains all of the appropriate provisions required under § 1123.

3. Debtor has complied with the provisions of § 1129(a)(2) of the Code by compliance with the disclosure and solicitation provisions of § 1125.

4. Pursuant to § 1129(a)(3), confirmation of the Plan requires that it be proposed in good faith and not by means forbidden by law. In this regard, the mere proposal of a cramdown under § 1129(b) is not bad faith. *In re Sun Country Development, Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). Where, as in the instant case, there is a reasonable likelihood that the Plan will achieve the objectives and purposes of the Bankruptcy Code by the restructuring and payment of debt and the preservation of economic units, the Plan is proposed in good faith. *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.S.D.Cal.1982). Since the Debtor, during its Chapter 11 case, has complied with all requirements imposed upon Debtors in Possession and the Plan preserves the preexisting economic unit with respect to the Property, the Plan has been proposed in good faith. See *In re Coastal Equities, Inc.*, 33 B.R. 898, 904 (Bankr.S.D.Cal.1983). The Debtor has complied with the provisions of § 1129(a)(5) of the Code since there will be no change in Debtor's ownership or management during the term of the Plan.

5. The provision of § 1129(a)(6) regarding the Plan's effect on rules and regulations promulgated by any state or federal regulatory agency is not applicable in the instant case.

6. Section 1129(a)(7) of the Code requires that the creditors not receive less under the Plan than they would otherwise receive in a Chapter 7 liquidation, and this is determined pursuant to what is commonly known as the "best interest" test. Since it previously has been determined that a liquidation of Debtor will yield less than the full value of each class as of the Effective Date, the best interests of the creditors are served. Furthermore, confirma-

tion and consummation of the Plan will more likely assure preservation of the interests of the current homeowners in the Elm Creek subdivision and of the HOA. In fact, this is the reason given by the HOA for its withdrawal of its objection to the Plan and its request, after the close of the evidence, that the Plan be confirmed.

7. As a further condition to confirmation, § 1129(a)(8) of the Code requires that each class of claims or equity interests either accept the Plan or not be impaired thereunder. Further, § 1129(a)(10) requires that at least one class of impaired claims accept the Plan without reference to any acceptance by an insider. As previously determined, Alamo in Class 2 has rejected the Plan and the holders of unsecured claims in Class 4 have accepted the Plan. Accordingly, the Debtor has complied with the provisions of §§ 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code. As stated in *5 Collier on Bankruptcy*, paragraph 1129.02, at p. 1129–36.3:

> If a plan satisfies the confirmation criteria set forth in Section 1129(a), including the requirement that if a class of claims is impaired, at least one impaired class of claims accepts the plan, the plan may be confirmed notwithstanding the opposition of one or more impaired classes of claims or interests, provided the plan satisfied Section 1129(b).

■ 8. The requirements of § 1129(a)(9) have been met by virtue of the Plan's provision for the payment in full and in cash of all priority claims on the Effective Date, or in the case of pre-petition taxes, the payment of the full amount of such taxes within six years after the Effective Date. Pre-petition taxes are provided for in Class 1A and one vote was received from the holder of a Class 1A claim voting in favor of the Plan while no votes were received in such class voting against the Plan. The Plan provides for interest on the Class 1A claims at the rate of nine percent (9%) and the Court finds that such an interest rate, together with the acceptance by the class, is sufficient to provide that the Class 1A claimholders will receive the full

amount of their respective allowed claims as established on the Effective Date.

■ 9. Section 1129(a)(11) of the Code requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." In effect, the Plan provides for the liquidation of the Debtor by the transfer and sale of property and payment of the debts and by the realization by Alamo of the indubitable equivalent of its secured claim. If the Class 3 claims are not paid within the term of the Plan, then the Class 3 claimants may enforce the Class 3 Deed of Trust lien by foreclosure. Further, all payments required to be made during the term of the Plan can and will be made by the members of the joint venture. There is no evidence to show that the members cannot or will not perform as provided. Thus "feasibility" has been established. There is no requirement that such payments will be guaranteed. *In re Imperial "400" National, Inc.,* 374 F.Supp. 949 (D.N.J.1974); *In re Huckabee Auto Company,* 33 B.R. 141, 145 (Bankr.N.D.Ga.1981). The evidence is uncontroverted that there is a reasonable expectation that the payments required to be made during the term of the Plan will, in fact, be made.

■ 10. Initially, § 1129(b) requires that for a Plan to be confirmed over the objection of an impaired class, the Plan must not discriminate unfairly and must be fair and equitable to the classes which the Debtor proposes to cram down. The only non-accepting impaired class is Alamo. For the purposes of determining whether or not the Plan discriminates unfairly, and is fair and equitable with respect to the class of claims that is impaired under and has not accepted the Plan, the Code provides that the condition that the Plan be fair and equitable includes, with respect to a class of secured claims, that the Plan provide for the realization by such holders of the indubitable equivalent of such claims. In this regard, under the Plan, Alamo is to receive the indubitable equiva-

lent of its secured claim. Further, the Plan is fair and equitable in that Alamo will receive a secured deficiency claim in an amount to be determined by the difference between the fair market value of the Lots at the date of confirmation, as determined by the Court, and the amount of its allowed claim. This deficiency claim is to be satisfied by the sale of property upon which Alamo did not have a pre-petition lien and the obligation is to be secured by a Deed of Trust. Under the terms of the Plan, the entire deficiency claim is being secured and paid with interest at the rate of ten percent (10%). Therefore, to the extent that an undersecured portion is being granted secured status, the interest on all of the deficiency claim at ten percent (10%) will yield to Alamo an effective rate of interest on the secured portion of its claim, if any, that is greater than ten percent. The other member of Class 3, HOA, has withdrawn its objection and asked the Court to confirm the Plan. Class 4, which is inferior to Class 3 and which is impaired, has voted to accept the Plan and has consented to Debtor's modification, whereby HOA is upgraded to a Class 3 claim.

## FURTHER OPINION OF THE COURT

Alamo has based its objections to confirmation of the Plan primarily upon the persuasive opinion of Judge Wesley W. Steen in the case of *In re Sandy Ridge Development Corp.*, 77 B.R. 69 (Bkrtcy.M.D.La. 1987). As of this date, Judge Steen's opinion is on appeal before the Fifth Circuit. Judge Steen's opinion is premised upon various criteria, including the following:

1. That the Debtor plans to give the lender collateral which cannot be valued speedily and accurately: usually land;

2. That the result may be that the lender will not receive the indubitable equivalent of its claim or, that the lender will receive too much and, therefore, that the absolute priority rule will be violated. *See* Section 1129(b)(2)(A)(iii) and (B)(ii).

In this case, the Debtor and the secured lender, Alamo, have raised the issue of indubitability; but, there is no unsecured creditor making an appearance or voting against the Plan, so the absolute priority rule issue is not before the Court. In fact, the other member of Class 3, in which Alamo's unsecured deficiency is treated, has withdrawn its objection, and has asked the Court to confirm the Plan; likewise, Class 4, the unsecured creditor class, has voted to accept the Plan. On the evidence before it, the Court finds that the absolute priority rule is not violated by the Plan.

This leaves the Court with a consideration of the concept, "indubitable equivalent." As pointed out by the notes of the Committee on the Judiciary, Senate Report Number 95–989, "the indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2nd Cir.1935)." In his opinion in *Sandy Ridge*, Judge Steen attaches some magic to the phrase "indubitable equivalent." He makes the phrase, as used in the Bankruptcy Code, almost a talisman, almost an occult formula demanding payment of the secured lender in the exact amount due and owing or in an exact amount measured by an exact valuation of collateral.

This Court does not feel that the phrase has such magic in it. It is simply an artful phrase, the history of which is well known. *See In re Murel Holding Corp., supra.* The phrase, however, does not imply that a creditor must receive the exact amount due and owing or the exact amount measured by an exact valuation of the collateral. It cannot. No creditor will ever receive such because courts, including this one, always will be required to make fact findings of present values of property. Such findings are not made by application of a magical formula or by an exact science.

Courts often are faced with the task of finding value, whether it be of collateral, property or claims as under the Bankruptcy Code, or of lost future earnings in personal injury cases, or of the value of gifts in tax cases (involving disputes as to the size of charitable deductions taken by a taxpayer) or, in cases very similar to this one, of the value of land or buildings for ad

valorem tax purposes or condemnation. These decisions are made daily at virtually every level of the judiciary. In such cases, courts are required to consider the evidence, including the opinions of experts, and to decide upon a value. Often these values will depend in part upon opinion as to what interest rates will prevail in the future, of what wage rates will prevail in the future, of what absorption periods or rates will prove correct.

Nevertheless, courts are called upon to consider and weigh the evidence and make findings of fact as to values. If the phrase "indubitable equivalent" means that the creditor must receive, dime for dime, an exact amount, then we must wait and allow the market to determine interest rates, absorption rates and all of the other factors that go into measuring the present value of collateral or property. Such exactness is impossible and impractical: to require it renders the concept of "indubitable equivalent" impossible to apply. Courts must find values in relation to market forces without direct reliance upon known or precisely knowable components of ongoing market forces.

If this court refuses to engage in the kind of fact finding task that the phrase "indubitable equivalent" must envision, then there are two alternatives: dismissal of the case or conversion to Chapter 7. In either instance in this case, the most probable result will be that the stay will be lifted and Alamo will proceed to a non-judicial foreclosure. As a practical matter, the non-judicial foreclosure process in Texas, while effective in permitting an almost effortless taking of the collateral by the secured lender, is far from a realistic method of determining the present fair market value of the collateral. To be realistic, we all know what happens at any foreclosure sale of realty, particularly of tracts as large and valuable as the one in question: to a time when man's mind runneth not, no one has ever appeared at a foreclosure sale to bid seriously on the property. Even Cassandra could not have foreseen such an unlikely event as this: that a foreclosure sale produce a sale price reflecting fair market value. This is the very reason for the rule announced in *In re Durrett*, 621 F.2d 201 (5th Cir.1980)[1].

The bankruptcy process, as with the tort damage suit, the condemnation case or the ad valorem tax proceeding, envisions some kind of finality. All of these suits envision the kind of finality that only comes with a determination of value. This is what the concept of "indubitable equivalent" envisions and what the Bankruptcy Code requires: that this Court determine value.

This case was not filed solely to prevent levy and execution or the like. The Debtor in this case neither was nor is a single purpose entity with no (or a short) history and existence. It has a definite and long term purpose and history. It is a real entity and not just a speculative joint venture formed for the sole purpose of holding raw land. Were this a case of a joint venture consisting of two joint venturers with a tract of raw land that had never done anything, the Court might, properly, deny confirmation and dismiss the case. But, such are not the facts in this case and dismissal will be denied.

Furthermore, there is usually no justification to use of the bankruptcy process simply to protect guarantors or joint venturers from ultimate liabilities. But, such is not the case here. The Plan confirmed by the Court today does not single out the guarantors or the joint venturers for protection. In fact, the joint venturers have testified of their clear understanding to the contrary.[2]

Finally, the Owners' Association, after closing of the evidence on confirmation, has announced through its attorney that it feels that it is in the best interests of those

---

1. *Durrett* probably does not apply post-petition.

2. There is, of course, the possibility that, under the Uniform Commercial Code, the reduction of the principal of the debt of the joint venture, that is the Debtor, accomplished by the credit granted herein and by the terms and conditions of the Plan, by the transfer of the lots to Alamo, may or may not affect any liability to Alamo which the joint venturers of Debtor and/or guarantors may have. But, on this point the Court gives no opinion.

living in the subdivision that the Owners' Association withdraw its objection to Plan confirmation and it did so withdraw the objection. The Owners' Association's primary objective, as stated through its counsel, is to keep a cohesive operation going and, in its opinion, that is best done by confirmation of the Plan before the Court. The Court agrees.

For all of the above and foregoing reasons, the Court concludes that the Plan in this case should be confirmed. Confirmation of the Plan is by separate Order of Confirmation entered confirming the Plan of Reorganization.