**In re CLUB CANDLEWOOD ASSOCI-ATES, L.P. a Georgia Limited Partnership, Debtor.**

**HOME FEDERAL SAVINGS, Movant,**

**v.**

**CLUB CANDLEWOOD ASSOCIATES, L.P., Respondent.**

**Bankruptcy No. 88–08590.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

March 24, 1989.

James C. Morton, Bondurant, Mixson & Elmore, Atlanta, Ga., for movant, Home Federal Sav.

John A. Christy, Schreeder, Wheeler & Flint, Atlanta, Ga., for debtor.

CONTESTED MATTER

MARGARET H. MURPHY, Bankruptcy Judge.

#### ORDER

This matter is before the court on Movant's motion to dismiss or, in the alternative, for relief from the automatic stay of 11 U.S.C. § 362 filed November 30, 1988. This case commenced October 3, 1988.

Debtor is a Georgia limited partnership whose sole asset is a 486 unit, 50 building apartment complex located on a 39.53 acre site in East Point, Fulton County, Georgia (the "Property"). Movant is a secured creditor which extended a $12.6 million refinancing loan to Club Candlewood Associates, a Georgia general partnership (the "General Partnership") which is the predecessor of Debtor. Movant's loan is secured by the Property.

Movant asserts that the case should be dismissed because Debtor filed this case in bad faith, or, in the alternative that Movant is entitled to relief from the stay pursuant to 11 U.S.C. § 362(d)(1) and (2). Movant's motion to dismiss on the basis of Debtor's bad faith is supported by the United States Trustee, who takes no position on the motion to lift stay.[1]

A hearing on Movant's motion was held, pursuant to notice to all creditors given November 7, 1988, on December 14, 1988, and February 17 and 28, 1989. During those hearings, the court heard testimony and reviewed documentary evidence concerning the value of the Property and its present condition as well as the operation of the Property by Debtor and its predecessor general partnership. The Court also heard evidence concerning Debtor's plans for reorganization and argument from counsel for Movant, the Debtor, and the United States Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Property was purchased by the General Partnership November 22, 1985 for $10.65 million with an investment of $1.0 million. The general partners of the General Partnership are Gerald Ashkouti, Albert Ashkouti, Evelyn Ashkouti, Diane Huey, Michael Hammer, and David Berkman (the "General Partners"). After completing some work on the Property, on December 29, 1986, the General Partnership refinanced the Property with a $12.6 million nonrecourse loan from Movant; by year end the General Partners had contributed another $164,276 in capital. Movant's loan permitted the General Partners to obtain the return of all of their $1.164 million capital contributions plus an additional sum of $216,000. In short, the General Partners have taken out more capital than they have contributed. (See M–15.) The General Partnership made its last loan payment to Movant in May 1988.[2]

After refinancing,[3] the Property's physical condition began to deteriorate and its occupancy rate dropped steadily from 92% when the loan closed to 71% in September, 1988. See M–22. The prevailing occupancy rates for the market in which the Property is located are in the low 90's. The break-even point in operation of the property is 88% occupancy. Following commencement of this case October 3, 1988, the occupancy rate of the Property continued to decline, reaching 64% during December, 1988. The Property suffers from extensive deferred maintenance and many of its units are currently uninhabitable. More than 140 of the 486 units need repairs whose cost will average at least $3500 per unit; additional work is required. See M–13.

Movant sent notices of default and acceleration to the General Partnership and advertised the Property for foreclosure to occur October 4, 1988. On October 3, 1988, the General Partnership "reconstituted" itself into a limited partnership, which then filed this action. With the exception of the new corporate general partner, Club Candlewood Associates, Inc., also formed on October 3, 1988, the limited partners of Debtor are the same as the General Partners of the General Partnership. When reconstituted, the only additional capital contributed was the $500 necessary to in-

---

**1.** The cross-examination of Debtor's principal by the U.S. Trustee was brief and cogent.

**2.** Pursuant to a Cash Collateral Order entered November 3, 1988, agreed upon by the parties, Debtor has made three partial loan payments since filing. The monthly debt service on the Property is $101,850.00. Debtor has made par-
tial payments totalling $185,361.00 since the date of entry of the Cash Collateral Order.

**3.** Prior to the loan closing, the property reached an occupancy of 88% near the time when the loan was approved.

corporate the new sole general partner. The corporate general partner has as its six shareholders the limited partners of Debtor.[4]

Since its purchase by the General Partnership, the Property has been managed by companies owned by insiders of Debtor. In September 1988, the Property's management company, Gateway Management, which is owned in part by one of the General Partners, was replaced by First Guaranty Management Corp., a company owned by three other General Partners. Prior to the changes in management, Gateway Management, which was normally paid based on the prior month's performance, was paid its management fee for October, 1988, prior to the Chapter 11 filing October 3, 1988.

Although the parties disagree as to the precise amount of Debtor's current secured indebtedness to Movant, they agree that the indebtedness now exceeds $13.1 million and may be in excess of $13.3 million. The precise amount of the secured indebtedness is not material to the court's ruling, however, as the court concludes that the current secured indebtedness substantially exceeds the current market value of the Property.

Movant's appraiser values the Property at $10.85 million. Debtor's appraiser values the Property at $14.6 million. The Property last sold in an arms-length transaction in 1985 for $10.65 million. Based upon the testimony of the appraisers, testimony concerning the current status of the market for properties of this type in the Atlanta, Georgia area, the Property's operating history since its acquisition by the General Partnership, and testimony concerning the current condition of the Property, the court concludes that the current market value of the property does not exceed $11 million. Thus, Debtor has no equity in the Property.

Irrespective of whether Debtor's limited partners, the former General Partners, are financially able to fund a successful reor-ganization by the infusion of sufficient capital upstream to the corporate general partner of the Debtor, they do not appear amenable to doing so. The General Partners seek to contribute only $285,000 to the Debtor for rehabilitation of the property, maintaining that the remainder can be accomplished well enough "in-house". Over the course of their ownership, Debtor's partners will have contributed, if their proposed Plan were to be confirmed, only $70,000 more capital to the Property than they have received from the Property—on which a $12.6 million loan was extended just two (2) years ago.

The Debtor's principal, who testified as the Debtor's representative, is a General Partner who described his expertise in the management of distress properties, and further described his business and that of his partners as the purchase of distressed apartments, followed by the performance of an "in-house" fix-up—i.e., using on-site personnel (apparently with little or no additional contribution of capital), and then refinancing. The General Partners, he testified, own significant real estate in the greater Atlanta metropolitan area and the Southeast. The court is left, therefore, with a choice of assumptions: either the General Partners cannot infuse any greater sums than proposed, or the General Partners have no intention of doing so. While no evidence was proferred by the Debtor on the point, it begs too much of the court's indulgence to presume that the General Partners could not infuse any greater sums than set forth in the proposed Plan. Accordingly, the court will assume that it is the General Partners' intention which is the barrier to infusion of sufficient cash to rehabilitate the Property, which is necessary to any meaningful reorganization of the Debtor's Property.

Movant and the U.S. Trustee contend that Debtor's petition in this action was not filed in good faith. Recent cases have set forth a list of indicia of the bad faith filing. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d

---

**4.** One or more of said limited partners may hereinafter sometimes be referred to as the General Partners.

1393 (11th Cir.1988); *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir.1987); *Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986). The standard for determining the existence of bad faith is the same whether the relief sought is dismissal or relief from the automatic stay. *Phoenix Piccadilly, supra,* at 1393–94; *In re Little Creek Development Co.*, 779 F.2d at 1072.

▪ Bad faith is apparent when it is clear that a Debtor filed its petition to frustrate the legitimate efforts of secured creditors to enforce their rights, while having no realistic expectation of reorganization. *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984). *See also In re Sar–Manco, Inc.*, 70 B.R. 132 (Bankr. Mid.Dist.Fla.1986) (finding bad faith where "the sole purpose of the Chapter 11 filing was to frustrate and delay the foreclosure action for as long as possible"). Factors which may indicate a lack of good faith include: (a) whether the debtor has only one asset, few unsecured creditors, and few employees; (b) whether the property is subject to a foreclosure action that the debtor was unsuccessful in defending; (c) whether the evidence shows the debtor filed merely to delay the efforts of secured creditors to enforce their rights; (d) whether the property was transferred to the debtor for the sole purpose of obtaining protection under the automatic stay provision of Chapter 11; (e) whether the debtor is using the bankruptcy provisions to create and organize a new business; and (f) whether the debtor lacks any realistic possibility of an effective reorganization. The latter consideration falls out of the ordinary factual underpinnings of a Chapter 11, wherein the Debtor is truly distressed. *Phoenix Piccadilly,* 849 F.2d at 1394–95; *Natural Land,* 825 F.2d at 298.

It is inescapable that Debtor has only one asset and employs fewer than a dozen employees; this alone does not indicate bad faith—apartment complexes may be run successfully with no greater number of employees. The scheduled claims of unsecured creditors total $133,949.45, which is relatively small in comparison to the debt of Movant; however, this factor alone does not justify a finding of bad faith.

▪ Other factors, however, require further consideration as to bad faith. Debtor was formed just before it filed for Chapter 11 protection and execution of the deed of conveyance may have occurred on or after filing the Chapter 11 petition.[5] The unsecured creditors, therefore, are in fact creditors of the General Partnership, rather than Debtor, and counsel for Debtor conceded that the unsecured creditors do have full recourse against the partners of the General Partnership.

As the unsecured creditors have direct recourse against the General Partners of the General Partnership, and the ad valorem property taxes are a lien on the Property,[6] that which remains for the court to administer in the context of a normal reorganization is a two-party dispute between the owners of the Property and the lender therein, *see, e.g., Stage I Land Co. v. HUD,* 71 B.R. 225 (Bankr.D.Minn.1986), which in this case centers on the cost of deferred maintenance, how quickly the property can be repaired and occupancy increased, how much capital must be infused to rehabilitate the Debtor, whether the Debtor's projections are feasible, and the remaining issues which inhere in confirming a Chapter 11 plan. The two-party dispute, alone, is insufficient to find bad faith—and absent other circumstances, would probably be insufficient in this case even in conjunction with the one-asset, few-employees, relatively-small-unsecured-debt factors. None of those factors weigh heavily enough to tilt the balance of this case away from good

**5.** While the date of the deed itself is October 3, 1988, the date of the notarization on the deed and the cross-examination of the Debtor's principal indicates the quitclaim deed from the General Partnership to Debtor may not have been signed until after the bankruptcy petition had been filed. The Debtor's principal could not recall exactly when he signed the deed, and the deed was not recorded until October 5, 1988, the day after the Chapter 11 petition was filed.

**6.** Debtor has not yet paid its 1988 City of East Point ad valorem property taxes of $24,373.15. Statement of Liabilities of Debtor, Schedule A–1.

faith to bad faith. Accordingly, as the bad faith factors revealed in the cited cases are not *per se* factors, to be applied absolutely, neither are they exhaustive: other factors exist in the present case.

Movant's witnesses included an accountant, whose expertise includes reviewing the financial operations of and working with troubled Chapter 11 debtors. The accountant reviewed the Debtor's books and records and prepared a financial analysis. As demonstrated by that analysis, Debtor and its predecessor—the General Partnership—did not operate the Property successfully following the refinancing from Movant. In fact, Debtor's own appraiser testified that Debtor permitted Gateway Management to mismanage the Property for more than two years before Debtor replaced them.[7] According to Debtor's appraiser, the Property currently requires at least $500,000 in repairs and deferred maintenance. Movant's expert witnesses estimated that the Property currently requires deferred maintenance costing between $800,000 and $1 million.[8] By either estimate, clearly the Property has been inadequately maintained with a result that occupancy has steadily declined from 92% in December 1986, when the loan closed, to less than 70% in October 1988. See M–22.

Despite the General Partnership's failure to make any loan payments since May 1988, the Property's occupancy rate continued to decline for at least seven months thereafter. As Debtor consciously accrued increasingly massive deferred maintenance and proposed a plan which belies no significant effort to make the necessary repairs to the apartment units, Debtor offers no adequate protection of the interest of Movant.

From the income generated solely by the Property, Debtor is unable to meet its obligations to Movant while making the repairs to the Property necessary to permit occupancy to increase significantly. Dozens of the Property's apartment units are completely unrentable, many of those totally uninhabitable, and will require extensive repair and reconstruction. Debtor's predecessor, a general partnership comprised of investors experienced in real estate management and operation, suffered the deferred maintenance largely by neglect. Debtor will be unable to rehabilitate the damaged apartments without a substantial infusion of capital, which its partners decline to provide. Such a capital infusion is not only necessary to provide Movant with adequate protection of its interest in the Property, it is necessary to achieve rehabilitation of the Property, which is necessary to reorganize the Debtor.

The court is disturbed by the "reconstitution" of the General Partnership into a limited partnership on the day of filing this Chapter 11 proceeding. Although Debtor consistently argued that the General Partnership and Debtor are the same entity,[9] the Debtor's explanation for the General Partnership's transfer to a limited partnership (on the eve of or just after bankruptcy) is that the "unsophisticated individuals dealing with [the Debtor's partners]" would otherwise be confused that the General Partners had actually filed bankruptcy rather than the partnership. Practically speaking, that rationale is not wholly un-

---

7. Debtor's principal testified that the only reason Debtor changed management companies when it did was to convince Movant of Debtor's plan to rehabilitate the Property. Debtor's principal, however, did not believe that Gateway had mismanaged the Property, but that the new management had performed differently and better.

8. Both Movant's and Debtor's appraisers' estimates of deferred maintenance excluded occupied and "rent-ready" units. Movant's appraiser testified, however, the the "rent-ready" units he was shown by management were, in his opinion, not ready to be rented, but contained defective appliances (missing parts of or whole appliances, missing counters) and had leaking water heaters.

9. Debtor argues that the Georgia limited partnership laws changed as of July 1, 1988 to allow limited partners to be involved in management and to be personally liable on partnership debts. Debtor maintains that the deed from the general partnership to the limited partnership, while obviously transferring title to the property, actually effected only a name change. Therefore, Debtor argued, under the Superior Court clerk's guidelines, no transfer tax was due or payable. Accordingly, none was paid.

justified and may be, outside the bankruptcy court, a legitimate business consideration. The protection of the bankruptcy court, however, carries with it concomitant consequences. If the natural and logical public relations consequences of the filing of a Chapter 11 petition by a debtor such as the General Partnership outweigh the value of the protections afforded the debtor seeking to reorganize in good faith, necessitating a change in entity, then perhaps the protection normally accorded to such a debtor is misplaced. Additionally, the decisions and actions of the General Partners, taken as a whole, belie an intent to use such technical means as are available to avoid the consequences of foreclosure without fully utilizing their ability to reorganize.

Absent an admission by Debtor's counsel in response to pointed questioning by the court, one primary effect of "reconstitution" could have been that Debtor's General Partners would have also been insulated from personal liability for post-petition expenses and operations as well as pre-petition obligations. Given the nonrecourse nature of the debt owed to Movant, from which limited liability remains only for unsecured debt, the utilization of the Chapter 11 process by the General Partners serves primarily as a means to avoid the consequences of foreclosure rather than a means to reorganize in good faith.

In this case, Debtor's partners' business is distressed property ownership and management. A greater portion of the distress falls upon Movant in the instant case than upon the Debtor or its partners, who seek to retain the Property with a net investment of only $70,000 over their past and projected ownership of the Property. While the increasing distress of the Property, following closing of the December 29, 1986 loan from Movant, may not have been intentional, one of the General Partners admitted in his testimony that only a year passed before the Property was recognizably distressed upon visual inspection when he walked through the Property. Thereupon, the General Partners changed neither management nor policy of operation and, despite their admitted expertise in distressed property management and ownership, failed to do anything substantial to stem the rapidly falling occupancy and the failing condition of the Property. Instead, they sought relief from Movant, the lender, in negotiations which stretched over the Spring and Summer of 1988. Indeed, at that point, the General Partners had nothing to lose: their investment had been entirely returned with $216,000 to spare.

The evidence reveals that the Property's most positive period of operation by the General Partnership occurred only long enough to refinance the Property. From refinancing, the General Partners repaid their capital contribution and reaped the sum of $216,000 in cash. Then the Property was allowed to decline by utilizing only the rents and profits from the Property's operations to maintain it. When the negotiations with Movant, which focused on the amount of money required to rehabilitate the property, failed, Movant sought to foreclose. On the eve of foreclosure, a new entity was created which, despite Debtor's arguments to the contrary, appears to have further insulated the General Partners from liability, either that which emanated directly from the Property or that which resulted indirectly. Despite the substantial property management experience and admitted expertise of Debtor's principals, the Debtor's General Partners have demonstrated no intention to infuse sufficient capital into the Property to achieve a good faith reorganization. Viewed in conjunction with other pre-petition events, which do not usually command scrutiny, it appears clear that Debtor fails to exhibit sufficient intention to propose a realistic plan for successful reorganization.

While Debtor's actions in this case fulfill virtually all of the indicia of bad faith, it is not the *per se* existence of many of such indicia, standing alone, which necessarily mandate a finding of bad faith. It is the entire context of the circumstances which compel the inference of abuse of the court's jurisdiction. A petition filed in bad faith may be dismissed even if Debtor has equity in its sole asset or some possibility of successful reorganization. *Phoenix Piccadilly*, 849 F.2d 1395. Accordingly, it is hereby

758

ORDERED that Debtor's petition is DIS-MISSED with prejudice.

IT IS SO ORDERED.