### In re Louis WERMELSKIRCHEN and Dorothy Wermelskirchen, Debtors.

### Bankruptcy No. 93–11998.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

July 20, 1994.

Jonathan P. Blakely, Cleveland, OH, for debtors.

Mario J. Fazio, Special Asst. U.S. Atty., Cleveland, OH.

Stephen D. Hobt, Cleveland, OH, for Charter One Bank.

John A. Valente, Cleveland, OH, for Salem Court Condo. Assoc.

*MEMORANDUM OF OPINION
AND ORDER*

RANDOLPH BAXTER, Bankruptcy Judge.

## I.

On May 27, 1994, this matter came on for a confirmation hearing on the Debtors' Amended Plan of Reorganization (Plan). Charter One Bank (Charter One) and the Internal Revenue Service (IRS) filed objections to the Amended Plan. The IRS withdrew its objection during the course of the hearing.

## II.

The Debtors are married individuals who own four investment properties. These consist of three duplex homes and a commercial condominium. With the exception of the commercial condominium, all mortgages are current. In addition to these investment properties, Mr. Wermelskirchen, a retired engineer, earns income from some consulting work and general maintenance he performs for his church. Mrs. Wermelskirchen works as a bank teller. The Debtors' financial difficulties arose from the loss of the sole commercial tenant in the condominium. Although it is alleged that the Debtors are solvent, they sought Chapter 11 protection to avoid depleting their retirement funds.

## III.

At issue is the Plan's proposal to return the condominium to Charter One and receive a credit toward the condominium note in an amount equal to the value of the condominium. Any deficiency is proposed to be paid off in four years by making payments at a 20–year amortization rate with a balloon payment at the end of the four-year period.

Charter One objects to the Plan because (1) it does not propose to pay the contract rate of interest to Charter One on its deficiency claim, (2) it does not provide Charter One with the indubitable equivalent of its claim, and (3) the plan is not feasible. The Debtors stipulated in Court that they would pay the contract rate of interest to Charter One on its deficiency claim thereby resolving that portion of the objection.

The principal owed on the condominium is $146,646.17. The interest is approximately $30,000.00. Both the Debtors and Charter One had the condominium appraised. The Debtors' appraisal was $150,000.00. Charter One's appraisal was $80,000.00. Charter One contends that at $80,000.00, it is not receiving its indubitable equivalent for its secured claim. 11 U.S.C. § 1129(b)(2)(A)(iii). In addition, the deficiency will be such that the Debtors will be unable to make full payment on that part of the claim as proposed in the Plan. 11 U.S.C. § 1129(a)(11).

### IV.

Valuation data was provided to the Court by both the Debtors and the Bank. Both parties had the subject commercial condominiums appraised by certified appraisers within a 45–day period prior to the plan confirmation hearing.

Kevin B. Riley appraised the subject condos for the Debtors. Mr. Riley's testimony revealed that he has performed appraisals, primarily residential appraisals, for 14 years. He has performed some commercial appraisals. Twenty (20%) percent of his appraisal work has been commercial during the past year. Principally working in Lorain County, Ohio, Mr. Riley has performed appraisals outside of that area as well. On April 22, 1994, he appraised the subject property, using a sales comparable approach, at a fair market value of $150,000.00. Four (4) comparables were used for purposes of his valuation, all of which he examined externally.

Mr. Riley described the subject property as being comprised of four (4) large commercial condominium units totalling 2,600 square feet. Constructed in 1979, he characterized these units as being "relatively new", with their condition being average to fair. Under his "Summary of Salient Facts", Mr. Riley characterized the property's marketability as being "below typical ... distressed". During cross-examination, he explained that by "below typical" he meant that there was general deferred maintenance on the property, including poorly maintained signage, landscaping, and other noted deficiencies. He further commented that the subject condos are the rear-most in this commercial condo complex and that these condo units are more neglected than those units located toward the front of the complex.

Mr. Riley's appraisal report also contained a County tax valuation on the subject property in an amount of $166,171.00. Reportedly, this figure represented a 100% tax assessment value. Mr. Riley was unable to state precisely when the County provided this assessed value, but believe it was for 1992. He further explained that the County's true market value on property is reduced by 33% to arrive at a tax assessment value.

From Mr. Riley's testimony (Direct), none of the comparables used by him were good comparables for the purpose of present valuation. Comparable # 1 was smaller and older than the Debtors' condo units; Comparable # 2 is superior to the Debtors', with very high appeal; Comparable # 3 is also far superior to the Debtor's; and Comparables # 4 and # 5, located one-half mile from the Debtors', is very new and is in superior condition to the Debtors' condos. Notedly, there have been no recent condo sales in the Debtors' complex. Of the eighteen (18) units in the Debtors' building only two (2) are occupied. The Debtors' condos were last offered for sale in the Fall of 1993 for $160,000.00. Ultimately, Mr. Riley testified that its chosen value for the subject property was based upon his subjective judgment.

Dennis B. Pell provided valuation testimony on behalf of the Bank. Mr. Pell's testimony, *inter alia*, revealed that he is a certified appraiser and has conducted appraisals for some 18 years. As president of his own company, in addition to staff supervision, Mr. Pell prepares real estate appraisals on commercial properties. Within the past twelve-month period he appraised an estimated for-

ty (40) commercial properties, including a recent appraisal of the Debtors' subject property. Mr. Pell testified that he has appraised approximately ten (10) commercial condominiums. He assessed the current condition of the Debtors' condos as being "Average minus". Only one (1) unit in the Debtors' building was occupied when he conducted his appraisal in April, 1994.

Mr. Pell, as did Mr. Riley, utilized a sales comparable approach in arriving at appraisal value of $80,000.00 for the subject property, at $30.00 per square foot. His appraised value contained specific factors for charged maintenance, management fee, and necessary repairs. Significantly, Mr. Pell was familiar with the foreclosure sales of two condo units in the Debtors' building which concluded in March, 1994. [According to earlier testimony during the hearing offered by Myron Stacher, an employee of the Bank, both units sold at foreclosure sale in the aggregate amount of $50,000.00. Mr. Stacher further testified that those units were one-half the size of the Debtors' four subject units.]

In concluding his testimony Mr. Pell testified that his appraisal value of $80,000.00 would be twenty-five percent (25%) higher if the four units were not the subject of a foreclosure sale.

Upon consideration of both appraisals, the Court establishes a fair market valuation on the subject four condo units at $100,000.00. This established value reflects, an adoption of the appraisal report submitted by the Bank through Mr. Pell. As the subject units are not the subject of a foreclosure sale, coupled with Mr. Pell's testimony that his appraisal would be 25% higher if no foreclosure sale was in play, the amount of $100,000.00 is a fair and reasonable market value for these commercial condo units.

Mr. Pell's appraisal report was more persuasive for the following reasons: (1) Mr. Pell is principally a commercial appraiser, compared to Mr. Riley who is primarily a residential appraiser; (2) Mr. Pell has appraised some 40 commercial properties within the past twelve-month period; (3) Mr. Pell has appraised ten (10) commercial condo complexes, whereas no such experience was indicated for Mr. Riley; (4) Mr. Riley's explanation of his "below typical … distressed" description of the subject property does not support a $150,000.00 value, especially in view of two condo units in the Debtors' building which sold in the aggregate value of $50,000.00 as recently as March, 1994. This is so even where testimony was provided by Mr. Stacher that the two foreclosed units were one-half the size of the subject units, and the fact that both appraisers agreed that foreclosure sale value generally runs between 20%–30% of fair market value. Combined, those several factors militate against a value as high as $150,000.00. Indeed, the two units sold at the March, 1994 foreclosure sale more appropriately support the appraised value offered by Mr. Pell. Accordingly, a fair market value for the four (4) commercial condominium units is established in the total amount of $100,000.00.

█ In view of the above valuation finding, the ultimate issue of feasibility of the Plan must be determined.

As structured, in addition to oral amendments, the Debtors' Plan proposes to pay a 100% dividend to all creditors, except the return of collateral treatment offered to the Bank. As orally amended at the Plan's confirmation hearing, even the Bank, which is undersecured, would receive 100% treatment as the Debtors promise to pay any and all deficiencies plus the contract rate of interest on the Bank's secured claim. Notwithstanding, the Bank, as the sole objectant, objects to plan confirmation on the basis of feasibility. Simply stated, the Bank questions the Debtors' ability to pay the anticipated deficiency on its claim within a four-year period at 8.5% interest. The Bank further argues that it would be entitled to an additional $30,000.00 in interest payments at the contract rate of interest which would further cause it to question the Debtors' ability to fully compensate its claim within the four-year period. *See, In re Terex Corp.*, 984 F.2d 170, 173–74 (6th Cir.1993); *In re Kentucky Lumber Co.*, 860 F.2d 674, 677 (6th Cir.1988).

In response to the Bank's concerns, the Debtors argued that sufficient funds are available to pay any deficiency on the Bank's

claim from the following resources: (1) $1,200.00 monthly net disposable income; (2) $45,000.00 total equity among the three duplex units they own; (3) plus $70,000.00 in various mutual funds, stocks, and/or certificates of deposit. Additionally, the Debtors argue that their proposed surrender of collateral will be free of the second lien held by the Salem Court Condominium Association (SCCA) due to the statutory effect of § 506(d) which, effectively, would eliminate SCCA's lien interest.

Both Charter One and the Debtors have submitted that the principal amount of the debt owed to Charter One on the condominiums is $146,646.17. (Charter One's Objection filed 3–23–94; Debtors' Posthearing Brief in Support). Because the Debtors are solvent[1], interest continues to accrue on the debt. *In re Kentucky Lumber Company,* 860 F.2d 674 (6th Cir.1988). According to Charter One's objection, there was an arrearage just prior to the filing of this case in the amount of $14,280.00. Interest and charges have been accruing since May 25, 1993. Thus, the current total debt is approximately $174,000.00.

Upon confirmation, the condominium will be transferred to Charter One and in exchange the debt will be reduced by the $100,-000.00 value of that property. Thus, the Debtors propose to pay Charter One, for their Class 10 unsecured deficiency claim, the approximate amount of $74,000.00, amortized over a 20–year period, for four years, with a balloon payment at the end of the four-year period. The Debtors' monthly payment will be approximately $642.00 per month for four years. The balloon payment will be approximately $55,542.00.

The Debtors also propose to pay SCCA for their Class 2 claim, the amount of $12,000.00, amortized over a 15–year period, with a balloon payment to be made at the end of three years. The monthly payment will be approximately $108.00. The balloon payment will be approximately $9,376.00.

The Debtors propose to pay Class 8, the Riviera Utility Water & Sewer Company, the amount of $600.00 over a six-month period at the interest rate of 7%. This monthly payment is approximately $102.00.

According to the Debtors' Disclosure Statement and Posthearing Brief in Support, the Debtors have $1,200.00 available to make the above payments to Classes 2, 8 and 10. Regarding those three classes, the Debtors' initial total monthly payments are $852.00, decreasing to $750.00 in month 7 of the Plan, and to $642.00 after 36 months. The Debtors will be able to make their monthly Plan payments and the Plan is feasible in this respect.

Additionally, the Debtors must make a balloon payment of $9,376.00 in the 37th month of the Plan, and a balloon payment of $55,-542.00 in the 49th month of the Plan. At the time these balloon payments come due, the Debtors will have in excess of $45,000.00 in equity in their realty holdings and in excess of $70,000.00 in their IRA, pension and stocks. It has been represented, without contest, that these assets are liquid and available to satisfy those balloon payments at the time they become due. Further, the Debtors have, in each month of their Plan, Plan fund contributions in excess of Plan payments which are also available on a cumulative basis for retirement of the balloon payments.

In view of the above computations, even the Bank's lower valuation figure regarding the subject condo units would still allow the Bank to recover fully on the deficiency attendant to the Debtors' surrender of the collateral (condos). Thusly, the Debtors' Plan sufficiently comports with the confirmation standard for cramdown under § 1129(b)(2)(A)(iii). That is, the Bank will, under the modified Plan, realize the indubitable equivalent of its claim.

Accordingly, the Plan, as modified at the confirmation hearing is feasible, with the Debtors having satisfied the requirements under § 1129(a) and (b) of the Code. The Plan is hereby confirmed, as modified. Within five (5) days of the entry of this Order, the Debtors are to submit a modified

---

1. According to the Debtors' Liquidation Analysis, they are solvent notwithstanding the reduced valuation of the condominium.

plan fully addressing the amendments orally made at the hearing as referenced herein.

IT IS SO ORDERED.