**In re PARK FOREST DEVELOPMENT CORPORATION, Bridge Corporation, Hill Land Corporation, Debtors.**

**PNC BANK, NATIONAL ASSOCIATION, Successor-in-Interest to Provident National Bank, Movant,**

v.

**PARK FOREST DEVELOPMENT CORPORATION, Bridge Corporation and Hill Land Corporation, Respondents.**

**Bankruptcy Nos. 95–77881 to 95–77883.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

March 26, 1996.

David Bisbee, Atlanta, GA, for Debtors/Respondents.

Joseph S. Sisca, Buchanan Ingersoll PC, Pittsburgh, PA, for Movant.

### ORDER

JOYCE BIHARY, Bankruptcy Judge.

These three jointly administered Chapter 11 cases are before the Court on PNC Bank, N.A.'s ("PNC's") motion to dismiss and on debtors' request for confirmation of a Chapter 11 plan. The matters involved herein constitute a core proceeding over which this Court has jurisdiction. *See* 28 U.S.C. § 157(b)(2)(A), (L) and (O). The parties pre-

sented their arguments and evidence at a hearing held on March 4, 1996, after which the Court took the matter under advisement. For the reasons set forth below, the Court will deny the motion to dismiss and set a hearing on the debtors' motion for valuation.

### BACKGROUND FACTS

The three debtors are Park Forest Development Corporation ("Park Forest"), Bridge Corporation, and Hill Land Corporation ("Hill Land"). Park Forest is a Florida corporation, whose only business is the ownership and development of a parcel of approximately 136 acres of undeveloped residential and commercial acreage in Florida (the "Park Forest Property"). Bridge Corporation is a South Carolina corporation, whose only business is the ownership and development of a parcel of approximately 203 acres of undeveloped residential and commercial acreage in South Carolina (the "Boy Scout Property"). Hill Land is a North Carolina corporation, whose only business is the ownership and development of a parcel of approximately 93 acres of undeveloped residential acreage in North Carolina (the "Hill Land Property"). Park Forest and Hill Land are owned equally by Edward L. Terry and S. Kent Owings. Bridge Corporation is wholly owned by Continental Financial Corporation, which is owned in equal shares by Messrs. Terry and Owings. The debtors have no employees, no assets other than the real estate, and their unsecured debts are small in comparison to the PNC debt.

On September 30, 1992, PNC and each of the debtors restructured existing loans between them, which were secured by each debtor's individual property. This restructuring was a part of a comprehensive workout agreement between PNC, the debtors, twelve (12) non-debtor corporate and partnership entities, and three (3) individuals, including Messrs. Terry and Owings. The workout restructured $25.6 million in debt, of which $10.7 million was owed by the three debtors here, secured by twelve (12) different properties. This workout agreement cross-collateralized the three debtor corporations' obligations, and guarantied those obligations with non-debtor guaranties from Messrs. Terry and Owings and from seven (7) affiliates of the three debtor corporations. All of these affiliates were owned or controlled by Messrs. Terry and Owings. At the March 4, 1996 hearing, Mr. Terry testified that, from September of 1992 until June of 1995, the $25.6 million debt was paid down to just under $6 million. (Hr'g Tr. at 31.)

The workout agreement expired on June 30, 1995, and PNC's debt matured. Prior to that date, Hill Land had attempted to pay its debt and obtain a release of the Hill Land Property. PNC rejected the payment, because of alleged defaults under the workout agreement. On September 21, 1995 PNC filed suit against the debtors and the nine (9) non-debtor guarantors in the United States District Court for the Western District of Pennsylvania (the "Pennsylvania Litigation"). Debtors filed petitions under Chapter 11 on December 13, 1995, and on December 19, 1995 the Court granted the debtors' motion for joint administration of the three Chapter 11 cases. PNC continues to pursue its claims against the non-debtor guarantors in the Pennsylvania Litigation, and the suit against the non-debtor guarantors is not affected by the automatic stay in bankruptcy.

### PNC'S DEBT AND THE PLAN

At the time the Chapter 11 cases were filed, Park Forest owed PNC $2,045,013.36; Bridge Corporation owed $3,823,331.50; and Hill Land owed $620,044.28, for a total debt of $6,488,389.14. As of the March 4, 1996 hearing, Park Forest owed $2,105,435.08; Bridge Corporation owed $3,940,112.71; and Hill Land owed $640,256.71, for a total debt of $6,685,804.50, as interest continues to accumulate. (PNC's Trial Ex. 6.)

At the time debtors filed the cases, they filed a plan, a disclosure statement, and a motion to value the three parcels of land. PNC opposed any valuation hearing early in the cases, and requested the Court first consider its motion to dismiss. The Court deferred the valuation hearing until after consideration of PNC's motion to dismiss and those confirmation issues that debtors' counsel suggested did not necessitate any findings on value. Thus, the parties have not presented appraisals or expert testimony on

the value or marketability of the three parcels.

■ The Court approved debtors' amended disclosure statement on February 14, 1996, and ballots were sent to the creditors. All voting creditors voted to accept the plan, except for PNC, which voted against the plan. The plan provides for the treatment of several classes, but the primary dispute between PNC and the debtors is over the treatment of Class Two, the PNC debt. The plan is what is commonly known as a "dirt for debt" plan. A "dirt for debt" plan requires the debtor to transfer to a secured creditor the asset securing the original loan obligation in full or partial satisfaction of the debt. *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 655 (9th Cir. BAP 1994).

The plan provides that the Court will value each of the three properties. After this valuation, the debtors will convey the Boy Scout Property and the Park Forest Property to PNC, free and clear of all liens other than the PNC liens. The value of the conveyed property will be credited against the PNC debt. (Debtors' Joint Plan ¶ 4.02(1), (2).) In the event a balance remains on the PNC debt after crediting the value of the Boy Scout Property and the Park Forest Property, either (1) the debtors will pay the balance of the PNC debt to PNC in cash, in full on the effective date of the plan, or (2) the Hill Land Property will be conveyed to PNC, free and clear of all liens other than the PNC lien, with the value thereof being credited against the PNC debt. (Debtors' Joint Plan ¶ 4.02(3).) Debtors have a commitment from Sunshine Mortgage to lend $600,000.00 to Hill Land to pay PNC under the first option.

If the value of the conveyed properties as determined by the Court exceeds the PNC debt, PNC will retain the excess. (Debtors' Joint Plan ¶ 4.02(5).) If the value of the three properties as determined by the Court does not satisfy PNC's debt, then the plan provides:

In the unlikely event that the Court determines that the conveyance of all three properties to PNC does not satisfy the PNC Debt in full, the value of such property, as determined by the Court, shall be credited against the PNC Debt, and PNC shall have its remedies for the balance due, after such credit, against Debtors and the [non-debtor] Guarantors.

(Debtors' Joint Plan ¶ 4.02(6).)

The plan gives PNC the option of receiving the property either through limited warranty deeds, the delivery of deeds currently in escrow (placed there under the workout agreement), or by PNC's foreclosure on the properties. PNC must make its selection within fifteen (15) days of confirmation; otherwise, the conveyances will be by delivery of the deeds in escrow. (Debtors' Joint Plan ¶ 4.02(4).) PNC argues that the Class Two treatment is not fair and equitable and does not give it the "indubitable equivalent" of its claim.

Debtors acknowledge that confirmation of the plan may affect PNC's claims in the Pennsylvania Litigation. The debtors' disclosure statement provides: "If the PNC Debt is satisfied in whole or in part by confirmation of the Plan, the claims asserted by PNC in the litigation will be similarly satisfied in whole or in part." (Am. Disclosure Statement ¶ 5.12.) PNC opposes the plan's effect on its claims against the guarantors. After the hearing, the non-debtor guarantors filed a pleading agreeing that any valuation by the Court would have the same binding authority and effect on the guarantors as such valuation has on PNC.

PNC also objects to the treatment of Classes Four and Five under the plan. These classes contain small mechanics' lien claims and unsecured trade claims and are treated identically under the plan. These claims will be paid in full by paying half of the allowed amount of each claim in cash on the effective date of the plan, and half of the allowed amount of each claim 120 days after the effective date. (Debtors' Joint Plan ¶¶ 4.04, 4.05.) PNC claims this payment schedule is an artifice designed to impair creditors likely to vote for the plan in an effort to comply with 11 U.S.C. § 1129(a)(10).

The plan will be funded by two non-debtor affiliates. Sunshine Mortgage, a Georgia mortgage lender ninety percent (90%) owned by Mr. Terry, has committed to making a

$600,000.00 first mortgage loan against the Hill Land Property, which would be used to fund a payment to PNC under the plan to satisfy the Hill Land debt. (Am. Disclosure Statement ¶¶ 5.03, 5.10, Ex. D.) McDaniel Road Development Corporation ("McDaniel Road") will provide unsecured loans to the debtors, which will be used to make the initial cash payments to creditors other than PNC. It has already deposited $112,550.37 in the escrow account of debtors' attorney (Am. Disclosure Statement Ex. E.), an amount sufficient to make contemplated payments of $70,916.65 to taxing authorities and $41,168.91 to trade creditors on the effective date. Debtors' tax obligations will be paid in full in cash on the effective date. (Debtors' Joint Plan ¶ 4.03.) McDaniel Road will make another loan to the debtors to fund the second payment of $41,168.91 to trade creditors, due 120 days after the effective date. Mr. Terry testified that McDaniel Road does not have these funds now, but will have them before the payment is due. (Hr'g Tr. at 40.)

## I. THE MOTION TO DISMISS

PNC argues that these cases should be dismissed or converted under 11 U.S.C. § 1112(b) as bad faith filings for three reasons. First, PNC argues that all of the factors set forth in the Eleventh Circuit case of *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly)*, 849 F.2d 1393 (11th Cir.1988), are present here, warranting dismissal of the cases. Second, PNC argues that the cases were filed solely for the benefit of Messrs. Terry and Owings and seven (7) related guarantors and that the true intent of the plan is to obtain a discharge for the non-debtor guarantors from part or all of their obligations to PNC. Third, PNC argues that the treatment of unsecured creditors and small lienholders is illustrative of the bad faith, because debtors have artificially impaired these claims.

■ In *Phoenix Piccadilly*, the Eleventh Circuit articulated a nonexclusive list of factors from which bad faith could be inferred:

(i) the debtor has only one asset, in which it does not hold legal title;

(ii) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) the debtor has few employees;

(iv) the single asset is the subject of a foreclosure action as a result of arrearages on the debt;

(v) the debtor's financial problems are essentially a dispute between the debtor and the secured creditors which can be resolved in the pending foreclosure proceeding; and

(vi) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*Phoenix Piccadilly*, 849 F.2d at 1394–95. Debtors do not challenge the existence of most of these factors. At the hearing, debtors' counsel admitted that the debtors are single asset entities, with few unsecured creditors and no employees, which are having trouble paying their secured debts. However, he persuasively argued that the timing of the filings did not indicate any intent to frustrate or delay PNC.

Indeed, the timing of the filings here distinguishes these cases from *Phoenix Piccadilly*. In *Phoenix Piccadilly*, the debtor filed the day before a hearing to appoint a receiver for the debtor's real estate, several months after mortgage foreclosure proceedings had begun. 849 F.2d at 1394. The filing of these cases did not stay any imminent action, and the Pennsylvania Litigation continues against the non-debtor guarantors. At the time of filing, PNC was not on the verge of obtaining possession of the properties. In fact, PNC has not sought relief from the stay and seems reluctant to take back its collateral.

*Phoenix Piccadilly* has not been applied mechanically, because "[b]ad faith in the filing of a bankruptcy petition is a finding of fact not subject to any per se approach." *In re Clinton Fields, Inc.*, 168 B.R. 265, 269 (Bankr.M.D.Ga.1994) (citing *Home Fed. Sav. v. Club Candlewood Assocs., L.P. (In re Club Candlewood Assocs., L.P.)*, 106 B.R. 752, 757 (Bankr.N.D.Ga.1989). The *Phoenix Piccadilly* case was a fact intensive decision where "the entire record reeked of malice, spite and

**394**

ill-will by the debtor." *In re Bicoastal Corp.*, 109 B.R. 467, 471 (Bankr.M.D.Fla.1989). The debtor in *Phoenix Piccadilly* used scorched earth tactics against its secured creditors when it threatened to file, and did file, a petition in a distant forum designed to forestall the secured creditors "for years." 849 F.2d at 1395. Without this sort of "smoking gun," indicating an "overt intent to inconvenience or frustrate creditors' rights beyond the congressionally permitted limits," *Sentry Bank & Trust Co. v. Goulding Place Developers, Inc. (In re Goulding Place Developers, Inc.)*, 99 B.R. 493, 499 (Bankr. N.D.Ga.1989), courts have been reluctant to find bad faith warranting dismissal.

■ The *Phoenix Piccadilly* factors are a guide for the exercise of the bankruptcy court's discretion and in and of themselves do not require dismissal.[1] *Clinton Fields*, 168 B.R. at 269. A real estate debtor should not be precluded from availing itself of the rehabilitative provisions of Chapter 11, unless other indications of bad faith are present. *In re North Redington Beach Assocs., Ltd.*, 91 B.R. 166, 168 (Bankr.M.D.Fla.1988). "[T]he real test that still remains is the presence of honest intention of the Debtor and some real need and real ability to effectuate the aim of the reorganization even if this involves the total liquidation of assets." *Id.* at 169. Based on Mr. Terry's testimony and the facts and circumstances attending these cases, the Court finds the debtors possessed no dishonest or improper intention when they filed their Chapter 11 petitions.

■ PNC also argues that the cases should be dismissed and confirmation should be denied, because these cases were only filed for the benefit of the non-debtor guarantors. PNC objects to any plan where the Court values its collateral, because PNC fears that a valuation coupled with a deed-back of the collateral will result in a release of all or part of PNC's claims against the non-debtor guarantors. It argues that this

case should be dismissed under the holdings of *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814 (5th Cir.1991) and *In re North Vermont Assocs., L.P.*, 165 B.R. 340 (Bankr.D.D.C. 1994). These two cases are distinguishable from the cases at bar. The plan in *Humble Place* specifically provided that the individual guaranties would be released. 936 F.2d at 816. In *North Vermont*, the debtor sought to enjoin the mortgagee's proceeding against the guarantors. 165 B.R. at 341. The plan in the cases at bar does not provide for a release of the guarantors, and the debtors here have not sought an injunction under 11 U.S.C. § 105 or any other relief to stay the Pennsylvania Litigation. In both *Humble Place* and *North Vermont*, the debtors sought bankruptcy relief to avoid an imminent foreclosure. 936 F.2d at 816; 165 B.R. at 340. Here, there was no imminent foreclosure. In both *Humble Place* and *North Vermont*, the debtors had liquid funds which they could have used to pay unsecured creditors before paying their lawyers a retainer to file the Chapter 11 cases. 936 F.2d at 818; 165 B.R. at 342. PNC has made no such argument here. Finally, it was significant in *Humble Place* that the property at issue could not be sold for a long time, and the estimates of value depended on a five-year sales period. 936 F.2d at 818. No evidence on the value and marketability of the three properties has been presented in the cases at bar.

■ While the debtors' plan may not be confirmable under 11 U.S.C. § 1129(b), which requires that the plan be fair and equitable as to PNC and that the plan not discriminate unfairly against PNC, the facts here do not call for an early dismissal. In other words, the fact that a debtor proposes to turn over collateral to a creditor on a debt guarantied by non-debtors does not by itself necessarily justify dismissing a case on bad faith

1. Debtors have suggested that *Phoenix Piccadilly* should no longer be followed, either because the Supreme Court would reject a good faith filing requirement as inconsistent with the language of the Bankruptcy Code, or because the Bankruptcy Reform Act of 1994, by sanctioning single asset real estate bankruptcies, implicitly overruled *Phoenix Piccadilly*. Neither argument has merit. *See Trident Assocs. L.P. v. Metropolitan Life Ins. Co. (In re Trident Assocs. L.P.)*, 52 F.3d 127, 130–31 (6th Cir.), *cert. denied*, ―― U.S. ――, 116 S.Ct. 188, 133 L.Ed.2d 125 (1995); *In re Midway Investments, Ltd.*, 187 B.R. 382, 388–89 (Bankr. S.D.Fla.1995).

grounds. The appropriate course here is to evaluate the debtors' plan.

■ PNC also argues, both in support of its motion to dismiss and in opposition to confirmation of debtors' joint plan, that debtors' plan artificially impairs the Class Four and Five trade creditors simply to secure a yes-voting impaired class. An accepting impaired class is required by 11 U.S.C. § 1129(a)(10).[2] PNC argues that payment of one-half of the allowed amount of each Class Four and Five claim 120 days after the effective date is an artifice designed solely to impair the two classes, because the debtors could obtain sufficient funding to pay all of the creditors in full on the effective date if they wished to do so. Previously, courts have been split on whether impairment of minor trade creditors is in bad faith and whether artificially impaired classes should be counted for the purposes of § 1129(a)(10). *Compare Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.),* 7 F.3d 127 (8th Cir.1993) *with L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.),* 995 F.2d 940 (9th Cir. 1993). *See also* David Gray Carlson, *The Classification Veto in Single–Asset Cases Under Bankruptcy Code Section 1129(a)(10),* 44 S.C.L.Rev. 565, 610–14 (1993).

Debtors argue in response that the Bankruptcy Reform Act of 1994 has eliminated the "artificial impairment" problem, because a class paid in full in cash is an impaired class under the current definition of impairment, citing Judge A. David Kahn's recent decision in *Equitable Life Ins. Co. of Iowa v. Atlanta–Stewart Partners (In re Atlanta–Stewart Partners),* Case No. 95–70542. Thus, even if Classes Four and Five were paid in full on the effective date, they would still be impaired classes entitled to vote on the plan.

In *Atlanta–Stewart Partners,* a creditor raised the artificial impairment argument in the context of a hearing on the plan disclosure statement. In rejecting the creditor's objections, Judge Kahn observed that the 1994 Reform Act completely deleted 11

U.S.C. § 1124(3) from the Code. *See* Bankruptcy Reform Act of 1994 § 213(d), Pub.L. No. 103–394, 108 Stat. 4106, 4125–26. Section 1124(3) had previously provided that a class of claims was unimpaired if the class received the entire allowed amount of its claims in cash on the effective date of the plan. Judge Kahn notes that Congress's intent in deleting subsection (3) was to abrogate the result reached in the case of *In re New Valley Corp.,* 168 B.R. 73 (Bankr.D.N.J. 1994). *See* H.R.Rep. No. 835, 103d Cong., 2d Sess. 47 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356. In the *New Valley* case, the bankruptcy court denied post-petition interest to creditors of a solvent debtor when each creditor was being paid in full and was therefore unimpaired under § 1124(3). Judge Kahn observes that deleting subsection (3) seems an extreme remedy for this problem, since the subsection could have been amended to distinguish between solvent and insolvent debtors. However, he concludes that the legislative history demonstrates Congress's intent to do exactly what it did by eliminating subsection (3). *Atlanta–Stewart Partners* is a case of first impression, and PNC has not addressed it or responded to debtors' argument. The reasoning of the *Atlanta–Stewart Partners* opinion is persuasive, and the Court will not dismiss these cases or deny confirmation simply because debtors have created Classes Four and Five as impaired classes.

In conclusion, the Court is not persuaded that the debtors filed these cases in bad faith. Debtors' representative credibly testified that the debtors did not have the cash necessary to pay off all the debts and that deeding back the real property was the only viable alternative. The bankruptcy filings have not hindered and delayed the lawsuit in Pennsylvania against the guarantors. PNC has not met its burden of proof in showing that it is entitled to a dismissal of these cases, and the debtors have established that they did not file these Chapter 11 cases in bad faith.

---

**2.** Section 1129(a)(10) requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

## II. OBJECTIONS TO CONFIRMATION

■ PNC objects to confirmation on a number of grounds, but the key objections are that the plan is not fair and equitable to PNC under § 1129(b)(2)(A), the plan discriminates unfairly against PNC in violation of § 1129(b)(1), the plan is not feasible under § 1129(a)(11), and the plan is not proposed in good faith under § 1129(a)(3). PNC appears to argue that findings in its favor on all these objections can be determined without hearing any evidence on the value of the real estate. After carefully reviewing the plan and the case law on "dirt for debt" plans, the Court finds the determinations necessary for sustaining or overruling these objections cannot be made without hearing evidence on the value and marketability of the properties.

■ Findings on the value of the real estate are necessary to determine whether the indubitable equivalency requirement in § 1129(b)(2)(A)(iii) will be met. The value of the real estate will indicate whether the plan before the Court will result in the conveyance of all or a portion of the collateral to PNC. A creditor receives the indubitable equivalent of its secured claim when it receives all of the property to which its lien attaches, because "common sense tells us that property is the indubitable equivalent of itself." *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1350 (5th Cir.) ("*Sandy Ridge I*"), *reh'g denied*, 889 F.2d 663 (5th Cir.1989) ("*Sandy Ridge II*"); *see also In re Western Real Estate Fund, Inc.*, 109 B.R. 455, 464 (Bankr.W.D.Okla.1990). Plans that only convey part of the property securing the claim are more difficult. "[W]here the creditor is earmarked to receive *part* of its collateral, it will be a rare case in which the creditor will have received the indubitable equivalent of its claim." *Arnold & Baker Farms*, 177 B.R. at 660; *see also In re Walat Farms*, 70 B.R. 330, 334 (Bankr.E.D.Mich.1987). A valuation hearing will be necessary to see if debtors will be deeding all or part of the collateral, and thus findings on value are required in order to rule on this objection.

■ PNC's objections that the plan is not feasible or fair and equitable to PNC and the objection that the plan discriminates unfairly against PNC also require some findings on the amount of the secured claim, i.e., the value of the real estate. *See* 11 U.S.C. § 1129(a)(11), (b). Without a valuation hearing, the unsecured deficiency on PNC's debt is unknown. Knowing the size of the unsecured deficiency is essential to evaluating whether the debtors or non-debtor guarantors can pay the deficiency, whether the unsecured deficiency is being treated so differently from other unsecured creditors as to constitute unfair discrimination, and whether the plan is fair and equitable. Evidence on the marketability of the real estate and the expected holding time will also be relevant to the feasibility and fairness of the plan. *See Arnold & Baker Farms*, 177 B.R. at 662.

■ While PNC has opposed a judicial valuation of the properties, § 506(a) of the Bankruptcy Code contemplates that the bankruptcy court will value property collateralizing a secured debt. The bankruptcy court is directed to determine value "in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a); *see also* Fed.R.Bankr.P. 3012. Although valuation hearings can be tedious, the valuation of assets is often necessary to define and protect the rights of the parties and is "an integral part of the confirmation process under Chapter 11." *Sandy Ridge I*, 881 F.2d at 1354. In rejecting a creditor's argument that the bankruptcy court cannot set the value of property but must allow the foreclosure sale market to determine its price, the Fifth Circuit stated: "Although we recognize that property valuation is not an exact science, it remains an integral part of the bankruptcy process." *Id.*

■ The reported cases give some guidance on how to value land in contested confirmation hearings on dirt for debt plans. *E.g., In re Atlanta So. Business Park, Ltd.*, 173 B.R. 444 (Bankr.N.D.Ga.1994); *In re Hock*, 169 B.R. 236 (Bankr.S.D.Ga.1994); *In re Wermelskirchen*, 170 B.R. 118 (Bankr. N.D.Ohio 1994); *In re Elm Creek Joint Ven-*

*ture,* 93 B.R. 105 (Bankr.W.D.Tex.1988). A valuation of real estate in this context should be very conservative and allow the secured creditor an ample margin for error. *Atlanta So. Business Park,* 173 B.R. at 450; *In re Simons,* 113 B.R. 942, 947 (Bankr.W.D.Tex. 1990). Courts have considered whether to value the land at liquidation prices, *Simons,* 113 B.R. 942, 947–48, at a fair market value, deducting the costs of holding and marketing it during a disposal period, *In re Stockbridge Properties I, Ltd.,* 141 B.R. 469, 472 (Bankr. N.D.Ga.1992), or by discounting the land's expected ultimate sale value to a present value to reflect the time needed to dispose of the property, *Arnold & Baker Farms,* 177 B.R. at 657. Debtors acknowledge in their plan that the Court's valuation should take into account interest, fees, and other holding costs. (Debtors' Joint Plan ¶ 5.02.) Debtors may need to provide for a payment of estimated holding and disposal costs in cash on the effective date. *See Atlanta So. Business Park,* 173 B.R. at 452. At any valuation hearing, the Court would consider all issues bearing on value, including the costs of maintaining, marketing, and selling the properties during a disposal period, and the marketing efforts undertaken by debtors since these Chapter 11 cases were filed.

 The heart of PNC's objection to the debtors' plan is that it potentially effects a release of the liabilities of the non-debtor guarantors. PNC cites a number of cases where confirmation was denied because the plan did not comply with § 524(e) of the Bankruptcy Code, which provides that a debtor's discharge does not affect the liability of any other entity on the debt. In *In re Boston Harbor Marina Co.,* 157 B.R. 726, 729 (Bankr.D.Mass.1993) and *American Hardwoods, Inc., v. Deutsche Credit Corp. (In re American Hardwoods, Inc.),* 885 F.2d 621, 622 (9th Cir.1989), the plans provided for permanent injunctions against actions directed at non-debtors. In *In re Future Energy Corp.,* 83 B.R. 470, 485–86 (Bankr.S.D.Ohio 1988), the plan provided that any creditor receiving any distribution under the plan was conclusively presumed to have fully released the plan proponents from any debt for which any distribution was received.

 It is clear from these cases that Chapter 11 plans cannot call for the release of guaranties upon obligations of the debtor, as this violates § 524(e). However, these cases do not hold that a payment by a principal does not reduce the claim against the guarantor. A creditor is only entitled to a single satisfaction of its claim. 47 Am.Jur.2d *Judgments* § 979 (1969); *Restatement of Security* § 115 (1941). A Chapter 11 debtor with debts that are guarantied by others is not precluded from proposing a Chapter 11 plan, simply because a distribution may reduce the liability of the guarantor. However, a plan cannot release the liability of a non-debtor party beyond the amount actually paid by the debtor.

Here, the debtors' plan does not contain any provision for a permanent injunction like the plans in *Boston Harbor* or *American Hardwoods,* and it does not contain a full release of guarantors like the plan in *Future Energy.* The plan provides that "the value of such property, as determined by the Court, shall be credited against the PNC debt, and PNC shall have its remedies for the balance due, after such credit, against Debtors and the Guarantors." (Debtors' Joint Plan ¶ 4.02(6).) Debtors are attempting to make this valuation binding on PNC for purposes of reducing the claim against the guarantors, and PNC is concerned that it will not realize the value set by the Court when it actually sells the property. This is a legitimate concern that can be addressed in many ways. First, as stated earlier, the valuation should be very conservative. Second, the plan could be amended to provide that the valuation will not bind the guarantors or PNC. Third, the parties could agree to make the valuation binding on all parties and have the guarantors agree to a consent judgment for the deficiency. Another possibility is for the plan to be completely silent on the effect of the valuation.[3]

---

3. In many cases, it is a given that the plan is unclear regarding its effect on guarantor liability. *See Sandy Ridge II,* 889 F.2d at 664 n.* (discussion of state law deficiency claim in *Sandy Ridge I* not intended to describe the plan's effect on liability of guarantors); *Elm Creek Joint Venture,*

Under the current plan and the record, it is ambiguous what effect, if any, a court valuation might have on guarantor liability. The parties have not indicated what effect the taking of collateral will have on PNC's rights under applicable state law, and debtors have not clearly provided for the payment of any deficiency. Counsel should consider and address all these issues.

In accordance with the above reasoning, PNC's motion to dismiss is DENIED. Debtors' plan cannot be confirmed at this time, and valuation hearings will be set by separate order. After the properties are valued and debtor clarifies the treatment of PNC's claim in light of such valuation, a confirmation hearing will be promptly scheduled.

IT IS SO ORDERED.

93 B.R. at 112 n. 2 (court expresses no opinion on plan's effect on joint venturers and guaran-tors).